UNITED STATES of America, Appellee,

v.

Anthony J. LEISURE, Appellant.

UNITED STATES of America, Appellee,

v.

Charles M. LOEWE, Appellant.

UNITED STATES of America, Appellee,

v.

David R. LEISURE, Appellant.

UNITED STATES of America, Appellee,

v.

Paul John LEISURE, a/k/a John Paul
Leisure, Appellant.

UNITED STATES of America, Appellee,

v.

Steven T. WOUGAMON, Appellant.

Nos. 85–1590, 85–1595, 85–1596,
85–1607 and 85–1774.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1987.
Decided April 25, 1988.

Rehearing and Rehearing En Banc
Denied in No. 85–1774 June 10, 1988.

Rehearing and Rehearing En Banc Denied
in Nos. 85–1590, 85–1595, 85–1596,
85–1607 July 8, 1988.

**1350**

Richard H. Sindel, Clayton, Mo., for Anthony J. Leisure.

Robert H. Rice, Belleville, Ill., for Charles M. Loewe.

Irl Baris, St. Louis, Mo., for Paul John Leisure.

David Godfrey, Clayton, Mo., for Wougamon.

James Crowe, Asst. U.S. Atty., St. Louis, Mo., for U.S.

Before McMILLIAN, Circuit Judge, ROSS, Senior Circuit Judge, and BOWMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Anthony J. Leisure (No. 85–1590), Charles M. Loewe (No. 85–1595), David R. Leisure (No. 85–1596), Paul John Leisure (No. 85–1607), and Steven T. Wougamon (No. 85–1774) appeal from a final judgment entered in the District Court[1] for the Eastern District of Missouri upon jury verdicts finding them guilty of various racketeering, obstruction of justice, and unauthorized creation of destructive devices offenses. The superseding indictment in Count I charged all five appellants with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). All five appellants were charged in Count II with RICO conspiracy violations under 18 U.S.C. § 1962(d). Count III charged all of the appellants except Loewe with obstructing justice in violation of 18 U.S.C. § 1510 (1982).[2] Wougamon was charged individually in Count IV with a separate obstruction of justice count under 18 U.S.C. § 1510. Count V charged Paul and Anthony Leisure and one other person with making a destructive device without authorization from the Secretary of the Treasury in violation of 26 U.S.C. §§ 5861(f), 5871. Anthony and David Leisure along with two other persons were similarly charged in Count VI with unlawfully making a destructive device in violation of 26 U.S.C. §§ 5861(f), 5871.

Following thirty-four days of trial and twelve days of jury deliberations, the jury found Paul and David Leisure and Wougamon guilty on all four counts in which each was charged. Anthony Leisure was convicted on Counts I and II, but the jury was unable to reach a verdict as to him on Counts III, V, and VI. The jury found Loewe guilty on Counts I and II and not guilty on Count III.[3] Appellants received aggregate sentences ranging from thirty-six to fifty-five years.[4]

For reversal, appellants Anthony Leisure, Charles Loewe, David Leisure, and Paul Leisure collectively assert nine points of error: (1) the denial of their motion to suppress tape-recorded conversations obtained through electronic surveillance, (2) prosecutorial misconduct, (3) the restricted cross-examination of certain government witnesses, (4) the failure to take corrective action as to alleged violations by the

---

1. The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

2. This statute has subsequently been amended, as discussed *infra*, section XI.

3. The jury was unable to reach a verdict as to a sixth defendant, Robert Carbaugh, on Counts I, II, and III. Carbaugh subsequently pled guilty to a RICO conspiracy charge which is not before this court on appeal.

4. Anthony, David, and Paul Leisure have subsequently received additional sentences following their state court convictions for the murder of James A. Michaels, Sr., one of the predicate acts for the RICO charges in this case. Anthony was sentenced to life imprisonment without parole, Paul received a life term without the possibility of parole for fifty years, and David received a sentence of death. Charles Loewe awaits trial in the state courts for the Michaels murder.

government of the Jencks Act, (5) the admission of statements of co-conspirators under Fed.R.Evid. 801(d)(2)(E), (6) the failure to grant a mistrial due to mention by the government to the jury that David Leisure had been indicted on state murder charges, (7) the cross-examination of a defense witness without proper foundation, (8) the failure of proof as to the element of an "enterprise" in the RICO counts, and (9) the sufficiency of the evidence to support the obstruction of justice convictions under Count III. Appellant Wougamon separately presses four points for reversal: (1) the amendment by jury instruction of Count IV of the indictment, (2) the failure of the indictment as amended to allege a RICO violation, (3) the sufficiency of the evidence to support his RICO conspiracy conviction, and (4) the denial of his motion for a new trial based upon a newly discovered witness. For the reasons discussed below, we affirm all convictions of Anthony Leisure, Charles Loewe, David Leisure, and Paul Leisure. We affirm the convictions of Steven Wougamon as to Counts II and III, reverse the convictions of Wougamon as to Counts I and IV, vacate his sentences on Counts II and III, and remand to the district court for resentencing.

## I. *Background*

The facts of this case are vaguely reminiscent of a Mario Puzo novel, and concern the attempts of Paul Leisure and his associates to dominate two labor unions and criminal underworld of St. Louis, Missouri. The tale begins in 1964, when Paul Leisure and his brother, Anthony Leisure, were associated with James Michaels, Sr., the head of the Syrian organized crime family in St. Louis. During this time, Richard Leisure, the cousin of Paul and Anthony, and older brother of David Leisure, was shot to death in an East St. Louis, Illinois, tavern by Norman Peters, who was accompanied by Jack Issa. Both men were associates of James Michaels, Sr. The identity of the killers was kept from Paul and Anthony Leisure, however, because Michaels, Sr. was able to persuade the tavern owner to recant his identification of Peters and Issa.

In 1968 the Leisures became aware of the coverup, and aligned themselves with the Italian organized crime family in St. Louis headed by Anthony Giordano. In a loose alliance between the Syrians and Italians, Giordano and Michaels, Sr. together formed the hierarchy of Local 110 of the Laborers' International Union of North America, which has jurisdiction over the St. Louis metropolitan area. In view of this relationship, the Leisures did not seek retaliation against Michaels, Sr. due to fear of disapproval by Giordano.

In the early 1970's, the Leisures began to establish a power base of their own. Paul left his association with Giordano and, together with his brother Anthony, their cousin David Leisure, and Fred Prater, founded LN & P Tire Service, a towing business. Anthony Leisure became a business agent for Local 110. The Leisures' fortunes continued to rise when in 1977 Raymond Massud, the longtime business manager of Local 110, passed away. Although Raymond's son, John Massud, succeeded his father as the new business manager, Anthony Leisure assumed the title of assistant business manager, with the understanding that he would exercise the power of business manager and control the union. During this time, Charles "Obie" Loewe was employed at LN & P, and Joe Broderick, a former truck driver and noted street fighter, joined Local 110 as Anthony's assistant.

From 1978 until the first part of 1980, a power struggle took place over the leadership of Laborers' Local 110 and Local 42, a second Laborers' Local in the St. Louis area. Apart from Broderick's appointment to the union, Anthony Leisure did not believe that he had been accorded the powers over Local 110 that had been promised him. Tension grew when Michaels, Sr. and Giordano arranged for two of Giordano's nephews, Vince Giordano and Matthew "Mike" Trupiano, Jr., to enter the union as officers. Michaels, Sr.'s brother, Francis Michaels, and his grandson, James Michaels, III, were also added to the union's management in early 1980. The threat to the Leisures' position in the union came to a

head when Giordano and Michaels, Sr. insisted that Broderick be fired because they felt that the union's management positions should only be held by "family" members.

During the same time, Giordano attempted to increase his leverage in Laborers' Local 42 through the sponsorship of an associate, John Paul Spica, for membership in the union as a prelude to obtaining a management position. Raymond Flynn, a future associate of Paul Leisure, at that time controlled Local 42 and resisted the appointment of Spica. Flynn apparently felt threatened by Spica's appointment, and the two men engaged in a heated argument during the first week of November 1979. On November 9, 1979, Spica was murdered when a bomb destroyed his car.

The Leisures decided upon a similar course of action to protect their position in Local 110 following the death in June 1980, of Anthony Giordano. When John Vitale, former assistant to Giordano, succeeded to control of the Giordano family, the Leisures apparently felt that they had less to fear from the Italians. The death of Giordano altered the balance of power, and left the Leisures free to use force in their pursuit of dominating the unions. After some debate as to who among the opposition at Local 110 should be killed, the Leisures decided that Michaels, Sr. himself was the best target. Initially they decided to shoot Michaels, Sr. with shotguns at his favorite breakfast restaurant, but ultimately agreed that a car bombing would be preferable.

On September 17, 1980, Michaels, Sr. was killed when a bomb near the front end of his Chrysler Cordoba was detonated by remote control as he drove south on Interstate 55 in St. Louis County. Paul, Anthony, and David Leisure, Fred Prater, Charles Loewe, Joe Broderick, and a new addition to the Leisure group, John Ramo, all played various roles in the murder.

After the death of Michaels, Sr., the Leisures were able to remove Michaels, III from Local 110 in October 1980, and Raymond Flynn admitted Paul Leisure to the management of Local 42 in order to "call the shots" in April 1981. The Leisures were fearful that the Michaels group might

retaliate, however, and Paul Leisure began to start his car from afar by remote control. At one point Paul discussed preventing retaliation by killing all of the Michaelses, but Anthony Leisure persuaded Paul that it would not be necessary.

On August 11, 1981, Paul Leisure was seriously injured when a bomb exploded on the street underneath the driver's seat area of his automobile that had been parked in front of his house. Michaels, III and his brother, John Charles Michaels, Jack Issa, Norman Peters and his brother Robert Peters, Russell Schepp, and George "Sonny" Faheen were all implicated in the attempted murder.

While Paul was recovering, Anthony Leisure directed David Leisure and the other members of the Leisure group to attempt to locate members of the Michaels group for the purpose of retaliation. David located Robert Peters in St. Louis and learned that he worked as a supervisor at Pepsi-Cola. Anthony and David Leisure, Broderick, Loewe, and Ramo traveled to Peters' worksite and prepared to shoot him with a shotgun from a van as Peters left work, but the attempt was called off because they feared that they appeared suspicious to an onlooker. At about the same time, Anthony Leisure, Broderick, and Flynn made a trip to the Michaels family farmhouse near Fredericktown, Missouri, armed with a shotgun and pistols, but no one was home. Nonetheless, Flynn suggested that they lower dynamite into the chimney so that "the whole cabin would blow up" when the Michaelses started a fire, but this suggestion was not carried out.

During the weeks following the Paul Leisure car bombing, the Leisure group also located John Charles Michaels, and learned that he routinely ate lunch at the Edge Restaurant in St. Louis. Shortly after lunchtime on September 11, 1981, Anthony Leisure shot John Michaels and his associate, Dennis Day, with a shotgun in the parking lot of the Edge Restaurant. One of the men was shot in the arm and the other in the abdomen, but both survived. Loewe, Broderick, and David Leisure as-

sisted Anthony in the planning and execution of the attempted murders.

Shortly after the restaurant shooting, the Leisures located another of those who had participated in the Paul Leisure car bombing, George "Sonny" Faheen. David Leisure enlisted several of his friends, including Michael Kornhardt, Robert Carbaugh, and Frank Termine, to follow Faheen and determine the best location in which to murder him.

Faheen was killed at about noon on October 16, 1981, when a bomb exploded in his Volkswagen as he was attempting to start it in the garage of the Mansion House apartments in downtown St. Louis. Anthony and David Leisure, Kornhardt, Prater, Ramo, Broderick, and Flynn all played various roles in the planning, execution, and coverup of the Faheen bombing.

Immediately following the Faheen murder, the Leisures' fortunes began to fall. Federal and state authorities had been investigating the group's activities, and Kornhardt was arrested the following day on state charges in connection with the Faheen murder. Ramo, Loewe, and David Leisure temporarily left the St. Louis area to avoid arrest. In March 1982 Termine was arrested on state charges in Illinois and agreed to testify against Kornhardt about Kornhardt's role in the Faheen murder. The Leisures began to worry that Kornhardt might also agree to cooperate with the federal authorities and testify against them.

On July 31, 1982, at about 7:30 a.m., Michael Kornhardt was found murdered in a roadside ditch in a rural area of St. Charles County, Missouri. He had been shot twice in the head by Robert Carbaugh, with the assistance of Steven Wougamon. Paul Leisure had promised both men union positions for the murder. Shortly before the shooting, Paul enrolled Wougamon in Local 42, and Carbaugh was registered as a new union member on August 3, 1982, three days after he killed Kornhardt.

In spite of the silencing of Kornhardt, law enforcement officers arrested David Leisure on August 4, 1982, on state charges in connection with the Faheen murder. On August 16, 1982, Fred Prater contacted federal law enforcement officials and advised them that he wished to cooperate with their investigation of the Leisures. On August 19, 1982, he gave extremely damaging testimony regarding the Leisure group's activities before a federal grand jury.

On November 9, 1982, federal law enforcement officials contacted Wougamon's brother-in-law, Innes Anderson, who had from time to time been let in on the details of the Leisure group's criminal activities. Anderson agreed to cooperate with the investigation. After Anderson returned home that evening, Wougamon visited him. Anderson denied cooperating with officials, and Wougamon told Anderson that if he had "snitched," he was "dead," and that there was no way that Wougamon could protect him or his family from the Leisures, even if they left town. Anderson and his family left St. Louis under government protection the following day, and did not return until the day of his testimony at trial.

Appellants were indicted in April 1983.[5] A superseding indictment, without substantial change in the charges, was filed on December 1, 1983. The jury reached its verdict on April 2, 1985, and all of the appellants except Wougamon were sentenced on May 1, 1985. Due to the filing of a post-trial motion, the denial of which he has raised as an issue in his appeal, Wougamon was not sentenced until June 10, 1985. This appeal ensued, and we turn first to the nine points raised collectively by appellants Paul, Anthony, and David Leisure, and Charles Loewe.

## II. *Electronic Surveillance*

Appellants first challenge the admission into evidence of tape recordings of conver-

---

5. Robert Carbaugh, John Ramo, and Joe Broderick were also indicted. Ramo and Broderick entered guilty pleas in exchange for testimony some months after the indictment. The jury was unable to reach a verdict as to Carbaugh, who pled guilty to a RICO conspiracy charge on the eve of his retrial.

sations obtained by electronic surveillance by federal law enforcement officers. These recordings were an important part of the government's evidence at trial. The surveillance began in February 1982 after the Faheen murder. Application was made on February 8, 1982, to the Honorable John F. Nangle, now Chief Judge of the United States District Court for the Eastern District of Missouri, for an order authorizing interception of oral communications in the LN & P office and authorizing surreptitious entry for the purpose of placing the necessary listening device. An order granting the application was entered on the day of the application. This authorization was subsequently renewed by court order for a total of seven months. On April 23, 1982, two months after the start of surveillance at LN & P, an additional application for surveillance at Paul Leisure's home was granted. Federal law enforcement officers also conducted electronic surveillance at two other locations which are not challenged in this appeal. Appellants argue the district court erred in denying their pretrial motion to suppress evidence obtained from the surveillance conducted at the LN & P office and Paul Leisure's home. We begin by considering their arguments regarding the LN & P surveillance.

A. *The LN & P Surveillance*

Appellants raise four challenges to the LN & P surveillance: (1) the sufficiency of the affidavits in support of the application for surveillance, (2) the necessity for the surveillance, (3) the failure to restrict the intrusiveness of the surveillance, and (4) the failure of the district court to grant appellants a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 2d 667 (1978) (*Franks*).

1. The sufficiency of the LN & P affidavit. Appellants assert that the LN & P affidavit is deficient in that it failed to establish probable cause to believe (1) that Paul Leisure and others had committed or were about to commit RICO offenses, (2) that communication relating to the RICO offenses would be intercepted, and (3) that the LN & P offices were being used in connection with the RICO offenses or were

commonly used by those whose communications were to be intercepted. We agree with appellants that the affidavit must establish probable cause as to these facts in order to properly support an order of electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2520.

▮ We begin our analysis by noting that affidavits in support of electronic surveillance orders are to be judged by the same standards as conventional search warrants; the statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the fourth amendment. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Falcone*, 505 F.2d 478, 481 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975). We are also cognizant that

> [t]he application for the wire interception must be viewed in a "commonsense way" to determine if there were ample facts to establish probable cause to grant the wire interception request. "[I]n judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense."

*United States v. Kirk*, 534 F.2d 1262, 1274 (8th Cir.1976) (citation omitted).

▮ Appellants engage in a "divide and conquer" attack on the affidavit, and urge this court to undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole. We decline this invitation to review the affidavit in an overly stringent and hypertechnical fashion. "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief" that evidence of criminality by the subject of surveillance would be obtained. *Carter v. United States*, 729 F.2d 935, 939 (8th Cir. 1984) (*Carter*); *see also United States v.*

*Townsley*, 843 F.2d 1070, 1076, (8th Cir. 1988) ("punctilious paragraph-by-paragraph dissection of the supporting affidavit" "not our standard of review"). As the Supreme Court has stated, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see also United States v. Mims*, 812 F.2d 1068, 1072 (8th Cir.1987) (*Mims*). We are to afford deference to the magistrate's determination of probable cause, *Mims*, 812 F.2d at 266, and we will not reverse the district court's determination of probable cause absent a conclusion that the finding is clearly erroneous. *United States v. Briley*, 726 F.2d 1301, 1306 (8th Cir.1984). After carefully reviewing the extensive affidavit submitted in support of the LN & P surveillance order, we cannot say the district court clearly erred.

First, we are persuaded that the affidavit establishes probable cause to believe that the Leisure group was engaged in racketeering activities. On this point, we agree with the government that the probable cause established by the affidavit consists of a number of layers. At bottom is a series of murders and attempted murders beginning with the fatal car bombing of John Spica in November 1979, and continuing through the fatal car bombing of Michaels, Sr. in September 1980, the car bomb maiming of Paul Leisure in August 1981, the shooting of Dennis Day and John Charles Michaels in September 1981, and the fatal car bombing of George "Sonny" Faheen in October 1981. The relationship of the various targets, the affinity for car bombs, and the sequence of the crimes raises the inference that these events may be related and that retaliation may be a motive for the assaults.

This inference is then fleshed out with detailed information from nine confidential informants with past histories of reliability. These informants, who often corroborate each other, provide extensive and precise information about the early association of Paul Leisure with Michaels, Sr.; the murder of Richard Leisure and the Leisures' attempts to control Laborers' Locals 42 and 110; the death of Anthony Giordano and the murder of Michaels, Sr.; the attempted murders of Paul Leisure, John Charles Michaels, and Dennis Day; and the murder of George "Sonny" Faheen. The informants also detail the relationship of various members of the Leisure group with Paul Leisure, and the Leisure group's involvement in the several murders and other acts of racketeering.

Finally, much of this information from the nine informants is corroborated by independent investigation by law enforcement officials. This evidence includes telephone toll records and surveillances that corroborate associations and certain patterns of criminal activity, labor union affiliations and how they shifted after the death of Michaels, Sr., physical evidence obtained from investigation of the Paul Leisure car bombing, and information obtained in the course of the investigation of David Leisure, Robert Carbaugh, and Michael Kornhardt in connection with the Faheen car bombing.

Appellants assert that the affidavit was "but a carefully worded opus of prejudicial innuendo artfully balanced upon the uncorroborated conclusions of confidential informants." Only "the hyper-technical examination of [each] informant's tip with excessive attention focused on isolated issues," *Carter*, 729 F.2d at 939, could lead to such a conclusion. That sort of review was condemned by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). While not every fact related by every informant is fully supported by exhaustive statements as to the informant's basis of knowledge, such concerns are not *per se* grounds for disregarding the information, but are merely relevant considerations in assessing the totality of the circumstances. *Id.* at 233, 103 S.Ct. at 2329. We conclude that the affidavit, when viewed as a whole, provided the magistrate with probable cause to believe that the Leisure group was engaged in RICO

activities, and the district court's finding to this effect is not clearly erroneous.

Appellants also challenge the sufficiency of the affidavit to establish probable cause to believe that communication concerning the RICO offenses would occur at the LN & P office. As discussed above, the affidavit provides probable cause to believe that Paul Leisure and his associates, who are readily identified with Paul's "business," LN & P Tire Service, were engaged in racketeering activity. Physical surveillance by law enforcement agents revealed that the LN & P office was a common meeting place for various members of the Leisure group. Three confidential informants revealed that the LN & P office was used by the Leisure group to discuss and plan criminal acts related to the group's racketeering enterprises. Such activities, as a matter of common sense, would have to be discussed somewhere, and we are unwilling to find that the district court's determination that there was probable cause to believe that these discussions would occur at the LN & P office is clearly erroneous.

Appellants next point out that Congress did not intend Title III to authorize the use of electronic surveillance to investigate every type of crime. Electronic surveillance is limited to the investigation of those offenses enumerated in 18 U.S.C. § 2516. Appellants argue that the affidavit failed to sufficiently allege the commission of an offense enumerated in 18 U.S.C. § 2516. RICO violations of the variety alleged in the affidavit, however, are among the offenses for which Congress specifically authorized investigation by electronic surveillance.[6] Appellants assert that the affidavit did not sufficiently allege a RICO violation because it did not describe a distinct "enterprise" beyond those allegations which established the "pattern" of racketeering activity. The law is settled that to establish probable cause of a RICO enterprise, the affidavit must supply reason to believe that the group had some continuity of structure and personality, and the partici-

pants must maintain their common purpose. *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The affidavit is permeated with evidence providing probable cause to believe that the Leisure group constituted an "enterprise" dedicated to the common goal of dominating the St. Louis underworld and two local Laborers' Unions through fear and violence.

2. The necessity for the LN & P surveillance. Appellants further challenge the affidavit on the ground that it failed to sufficiently demonstrate the government's need for electronic surveillance. Title III requires that applications for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Although electronic surveillance must be necessary and reasonable, "investigators need not exhaust specific or all possible investigative techniques before a court can issue a wiretap order." *United States v. Jones*, 801 F.2d 304, 314 (8th Cir.1986); *see also United States v. Garcia*, 785 F.2d 214, 223 (8th Cir.), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). Here, the application describes the failure of physical surveillance, pen registers, and telephone records to develop a prosecutable case against the Leisure group. The confidential informants themselves were unwilling to testify due to fear of bodily harm to themselves and their families. Reviewing the application in its entirety, we are satisfied that the government established that traditional investigatory techniques had failed or were too dangerous. *See United States v. Jones*, 801 F.2d at 314–15.

3. The intrusiveness of the surveillance. Appellants also argue that the LN & P surveillance order failed to adequately particularize the conversations sought to

---

**6.** The affidavit also alleged violations of 18 U.S. C. §§ 844(d), (i), and 372, which prohibit the interstate transportation of explosives. In view of our conclusion that the RICO allegations in the affidavit are sufficient, we do not reach the sufficiency of the alternative allegations.

be intercepted. All court orders of electronic surveillance under Title III must include "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c). In assessing the affidavit under this standard, we are wary of overly broad or vague descriptions of the communications to be intercepted, yet cognizant of the problem that "the actual content [of the conversation] . . . cannot be stated since the conversations have not yet taken place at the time the application is made and it is virtually impossible for an applicant to predict exactly what will be said concerning a specific crime." *United States v. Tortorello*, 480 F.2d 764, 780 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). This difficulty is particularly exacerbated where, as here, the offense under investigation is as broad as a RICO conspiracy. The variety of criminal activities that could be undertaken by those under surveillance for such an offense is so large that to require the applicant to describe them in advance with extreme particularity would render Title III totally ineffective under these circumstances. *See* W. Lafave & J. Israel, Criminal Procedure § 42(e), at 222 (1985).

The affidavit, insofar as it was possible under the circumstances, specified the nature of the communications to be intercepted:

> In particular, these oral communications will concern: The times and place of future acts and threats involving planned murders, attempted murders resulting in felonious assaults, conspiratorial agreements to commit planned murder, committed by or on behalf of employees or associates of the enterprise. The oral communication will further reveal the identity of the individuals who will order and carry out these acts, evidence of the association of the participants involved in the enterprise, and details of the operation of the enterprise and the participants therein.

We conclude that on the facts of this case, given the broad nature of the offense under investigation, the application and supporting affidavit described the communications to be intercepted with sufficient particularity to satisfy 18 U.S.C. § 2518(4)(c).

■ 4. The necessity of a *Franks* hearing. Appellants' final challenge to the LN & P surveillance application is that the government indulged in the reckless and deliberate use of false information and the omission of material exculpatory information in obtaining the surveillance order such that appellants were entitled to a *Franks* hearing. In *Franks*, the Supreme Court set forth the circumstances in which a hearing should be held for the purpose of inquiry into the veracity of an affidavit in support of a search warrant. First, the defendant must allege that the affiant made statements which were deliberately false or in reckless disregard of the truth. *Id.* 438 U.S. at 171, 98 S.Ct. at 2684. The defendant must support this allegation with an offer of proof. *Id.* If the district court is satisfied that the defendant has made sufficient allegations and offers of proof, it must grant the defendant an evidentiary hearing on the issue if, disregarding the allegedly false statements, the affidavit is insufficient to support a finding of probable cause. *Id.* at 171–72, 98 S.Ct. at 2684–85; *United States v. Bulgatz*, 693 F.2d 728, 732 (8th Cir.1982), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 444 (1983).

■ The only allegations of deliberate or reckless falsehood made by appellants concern (1) the precise relationship between John Vitale, Tony Giordano, and Paul Leisure, (2) the length of time that Anthony Leisure had been a member of Local 110, and (3) minor details about David Leisure's appointment to the management of Local 42. These possible falsehoods are largely peripheral to the activities alleged in the affidavit giving rise to probable cause. We are unable to view as clearly erroneous the district court's determination that, even assuming the truth of appellants' allegations, the affidavit sufficiently established probable cause.

Appellants' allegation that the applicant omitted material information by failing to

disclose the identity of one of the confidential informants similarly fails to warrant a *Franks* hearing. This argument is based purely on appellants' speculation about the identity of this informant, and is completely unsupported by any offer of proof by appellants. If speculation as to the identity of a confidential source were sufficient to compel a *Franks* hearing, the confidentiality of these sources would evaporate.

In summary, we hold that the initial order authorizing electronic surveillance of the LN & P office was proper, and that the district court did not err in denying appellants' motion to suppress evidence resulting from the surveillance. In view of our holding as to the validity of the initial LN & P order, we similarly reject appellants' argument that evidence resulting from subsequent extensions of the initial surveillance order should have been suppressed as the "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962).

## B. *The Surveillance of Paul Leisure's Home*

Appellants raise three challenges to the application and supporting affidavit for the electronic surveillance at Paul Leisure's home. They argue (1) the affidavit failed to establish probable cause, (2) the affidavit failed to demonstrate the necessity of electronic surveillance, and (3) the alleged reckless and deliberate use of false information and omission of exculpatory information in the affidavit warranted a *Franks* hearing.

■ 1. The sufficiency of the affidavit. We review appellants' assertion that the affidavit failed to establish probable cause under the same standard we applied to the LN & P application—whether the magistrate had a "substantial basis for concluding that probable cause existed." *Illinois v. Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332. The surveillance order was granted on April 23, 1982, with the full benefit of

conversations recorded at the LN & P office during the previous two months. These conversations, as related in the application, clearly established probable cause to believe that the Leisure group was involved in RICO activities. Appellants' probable cause challenge to the affidavit, therefore, is limited to whether there was probable cause to believe that evidence of criminality would be obtained from surveillance at Paul Leisure's home.

The affidavit contains extensive information from several of the confidential sources used in the LN & P application. The information given by these informants regarding the LN & P application had been in large part corroborated by the subsequent conversations obtained by the LN & P surveillance. This information was supplemented with information from other sources who had proven reliable in the past. Together, these sources related prior meetings at Paul Leisure's home in which criminal activities were discussed. Also, at least one source gave specific information regarding a criminal meeting expected to take place in the weeks following the application for surveillance between Paul Leisure and one Sorkis Webbe, Sr.[7] Physical surveillance related in the affidavit also confirmed that David and Anthony Leisure, Raymond Flynn, Fred Prater, and Joe Broderick made repeated visits to Paul Leisure's home. We find this information, viewed in the totality of the overwhelming evidence of the ongoing Leisure criminal enterprise, sufficient to establish probable cause to believe that evidence of criminal activity would be obtained by electronic surveillance of Paul Leisure's home.

■ 2. The necessity for electronic surveillance. Appellants next assert that the affidavit failed to establish the necessity for electronic surveillance. Because the LN & P surveillance uncovered substantial evidence of criminality, appellants appear

---

7. The details of the relationship between Paul Leisure and Sorkis Webbe, Sr., are more fully set forth in *United States v. Townsley,* 843 F.2d 1070 (8th Cir.1988). Although appellants argue that the scheduled meeting between Webbe, Sr., and Paul Leisure did not in fact take place until several months after it was scheduled, this is not relevant to whether there was probable cause at the time of the application to believe that such a meeting would take place.

to argue that this success barred the government from attempting to continue the investigation by further use of electronic surveillance. We reject this argument, and decline to hold that as soon as the government discovers evidence of crime it is prevented from expanding the scope of its investigation. *See United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.) ("Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the [criminal enterprise] is uncovered."), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

■■■ 3. The necessity for a *Franks* hearing. Appellants next argue that the application was fatally flawed by the reckless or deliberate use of false statements and omissions of material fact, and that the district court erred in denying appellants a *Franks* hearing. Appellants cite as material omissions (1) the fact that Webbe, Sr. had a legitimate relationship with Paul Leisure in addition to their criminal relationship, and (2) the fact that Paul Leisure was under the influence of alcohol during one of the communications intercepted at the LN & P office. Appellants failed to make any offer to prove that the government knew of these facts. Even if the government did know of these facts, they are insignificant when the affidavit is viewed as a whole; the affidavit established probable cause even if these omissions are assumed to be true.

Appellants also argue that the affidavit, in demonstrating the necessity of the electronic surveillance, attempted to mislead the magistrate into believing that the LN & P electronic surveillance had not been successful. We are somewhat perplexed by this argument because the government extensively relied upon the results of the LN & P electronic surveillance in order to establish probable cause of criminal activity at Paul Leisure's home. We find no error in the district court's denial of appellants' motion to suppress evidence obtained from electronic surveillance at Paul Leisure's home.

### III. *Prosecutorial Misconduct*

■■■ Appellants next assert that their convictions should be reversed due to prosecutorial misconduct. They challenge conduct engaged in by both federal and state prosecuting attorneys. Most of the complained-of conduct was challenged in a motion to dismiss the federal indictment that was originally filed by appellant David Leisure, who was a defendant in state criminal proceedings involving these events at the time of the indictment in this case. In the motion to dismiss, David Leisure alleged that various actions of the federal prosecutors had deprived him of procedural rights in his state court proceedings. We reject this argument, and hold that the district court properly dismissed these allegations as insufficient bases for relief in a federal court; any relief from the denial of state procedural rights must be sought in state court proceedings.

■■■ David Leisure also sought dismissal of the indictment because federal law enforcement officers had allegedly interviewed a prospective defense witness in the absence of the witness's lawyer. We similarly reject this claim, and uphold the district court's conclusion that Leisure lacked standing to assert the infringement of a third party's sixth amendment rights. *United States v. Peterson*, 698 F.2d 921, 924 (8th Cir.1983).

■■■ In a supplemental motion to dismiss, David Leisure added an allegation that before and after the federal indictment, federal agents had consulted with various individuals, including at least one former defendant, to act as informants for the government in confidential defense strategy discussions. Appellants were granted a hearing in which to develop an evidentiary basis for this "spy in the enemy camp" allegation, and propounded interrogatories to several witnesses who did not appear at the hearing due to their enrollment in the witness protection program. The magistrate did not force the protected witnesses to testify because, after review-

ing their answers to appellants' interrogatories, the magistrate concluded that none of the witnesses would have been helpful to appellants in proving their allegations.[8]

In order to obtain relief on this ground, appellants must not only show that the government actually obtained confidential information regarding defense strategy, but also some "demonstrable prejudice, or substantial threat thereof." *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). Reviewing appellants' evidence and allegations under this test, the magistrate found "no evidence on the record that any person improperly communicated to federal prosecutors or agents any material defense strategy information or confidential communication between any defendant remaining to be tried in this action and said defendant's counsel." The magistrate's recommended denial of appellants' motion to dismiss for prosecutorial misconduct was adopted by the district court. Appellants have raised serious questions about the conduct of the government in this prosecution, but on our review of the record, we are unable to find clearly erroneous the district court's finding that appellants were simply unable to prove that their allegations were true.

## IV. *Limitation of Cross–Examination*

■ At trial, David Leisure was represented by attorney Irl Baris. Baris had previously represented Fred Prater, Joe Broderick, and John Ramo, who each testified as a government witness against appellants. Appellants assert that they were denied their right of confrontation and effective cross-examination when the district court prohibited Baris from cross-examining his former clients regarding matters Baris may have learned about through attorney-client relations with the witnesses. Appellants assert that Prater, Broderick,

and Ramo waived their attorney-client privilege by testifying at trial.

The district court determined in advance of trial that Baris would not be permitted to examine his former clients on matters of privileged information, unless the witnesses specifically waived their attorney-client privilege either expressly or by disclosure to third parties. David Leisure was advised by the district court of this restriction on Baris's participation six months before trial, and Leisure indicated that he desired to have Baris continue to represent him. At trial, Baris renewed his request to freely cross-examine his former clients. The district court denied this request before Baris began his cross-examination of Prater, but told Baris: "If you think there is anything after you finish questioning that was in any way restrictive, you better put that on the record." In spite of this request, Baris failed to make any offer of proof as to the matters he was unable to inquire into, and gave the district court no idea of the nature of the evidence that Baris claimed was excluded. As we have previously stated, "[a]bsent an offer of proof as required by Rule 103(a)(2) of the Federal Rules of Evidence, neither the trial court nor the appellate court on review can truly ascertain what response was expected at the time." *United States v. Lavallie,* 666 F.2d 1217, 1220 (8th Cir.1981). Under these circumstances, we are unable to conclude that the district court abused its discretion in restricting the scope of Baris's cross-examination.[9]

## V. *Jencks Act Issues*

■ Appellants next argue that their convictions must be reversed because the government failed to produce handwritten notes prepared by law enforcement officials during their initial interviews with several government witnesses. These

---

**8.** Under the circumstances of this case, and given the propensity of appellants to violence directed at potential witnesses, as demonstrated by the murder of Michael Kornhardt, we find that allowing examination of protected witnesses by interrogatories was proper. We express no opinion on the propriety of this practice under differing circumstances.

**9.** In view of our disposition of this issue on the failure of Baris to make an offer of proof, we do not reach appellants' assertion that Prater, Broderick, and Ramo waived their attorney-client privilege by their testimony. We also note that all three witnesses were vigorously cross-examined without restriction by counsel for appellants other than David Leisure.

handwritten notes were organized and typed into summaries several days after each interview. The typewritten summaries were then used to prepare "memoranda of testimony," which were produced pursuant to the Jencks Act, 18 U.S.C. § 3500. The typewritten summaries were submitted to the district court *in camera,* which determined that the Jencks Act did not require their production. The initial handwritten notes were shredded after the typewritten notes were prepared. Appellants argue that the failure to produce the handwritten notes violated the Jencks Act. Where handwritten notes have been incorporated into typewritten notes, we review a Jencks Act challenge to the destruction of the handwritten notes by considering (1) the agent's good faith in destroying the notes, (2) the likelihood that the typewritten notes materially varied from the handwritten notes, and (3) the likelihood that appellants were prejudiced by the destruction of the notes. *United States v. Hoppe,* 645 F.2d 630, 634 (8th Cir.), *cert. denied,* 454 U.S. 849, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981); *see also United States v. Williams,* 604 F.2d 1102, 1116–17 (8th Cir.1979).

■ Appellants have adduced no evidence that the handwritten notes were destroyed in bad faith, or that the typewritten notes varied in any material way from the handwritten notes. We are unwilling to infer either of these conclusions from the sole circumstance of destruction.[10] Because there is no evidence that the typewritten summaries departed in substance from the handwritten notes, we are unable to conclude that appellants have been prejudiced by the failure to produce the handwritten notes. Accordingly, we find no violation of the Jencks Act in the government's destruction of the handwritten notes.

■ Appellants also allege that the government violated the Jencks Act by failing to turn over to them a statement taken from Charles Loewe's brother, Kenneth Robert Loewe, in which Kenneth Loewe confessed responsibility for the car bombing of Michaels, Sr., together with John Ramo. Loewe's statement was silent, however, on whether any of the appellants also participated in the car bombing, and we accordingly conclude that the statement was not sufficiently exculpatory to warrant a new trial.

## VI. *The Admission of Co-conspirators' Statements*

■ Appellants next challenge the admission of several tape-recorded conversations between Paul Leisure and his associates under the exception to the hearsay rule created for statements of co-conspirators in furtherance of a conspiracy. Fed.R. Evid. 801(d)(2)(E). Appellants contend that the conversations were not in furtherance of the conspiracy. The "in furtherance" element under Fed.R.Evid. 801(d)(2)(E) is construed broadly. *United States v. Lewis,* 759 F.2d 1316, 1340 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Massa,* 740 F.2d 629, 638 (8th Cir.), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1984). Reviewing the tape-recorded statements under this deferential standard, we are unable to find any statements which did not to some extent further the conspiracy. All of the conversations occurred between the members of the Leisure group and concerned various past events and future plans. While not every past event discussed directly involved the

---

**10.** The author is, however, troubled by the practice of shredding initial interview notes after typewritten summaries have been prepared. Under the three-factor analysis applied by this circuit, law enforcement officials may be able to destroy with impunity evidence that would be helpful to the defense. Evidence of "bad faith" will seldom be available to a defendant, and it is not at all clear how a defendant could demonstrate that the typewritten notes are likely to differ materially from handwritten notes which have been destroyed. Accordingly, the better practice is to retain handwritten notes after typewritten notes have been prepared and produce the handwritten notes at trial where called for. *See United States v. Williams,* 604 F.2d 1102, 1117 n. 7 (8th Cir.1979). While we are not prepared to hold that shredding the handwritten notes violated the Jencks Act in this case, a revised standard of review may become appropriate if the practice becomes commonplace.

Leisure group's activities, the overall effect of the conversations, which were often dominated by Paul Leisure, was to solidify and facilitate the conspiracy. We therefore reject appellants' argument that the conversations were not properly admitted as co-conspirators' statements under Fed.R. Evid. 801(d)(2)(E).

## VII. *The Mention to the Jury of David Leisure's State Indictment*

■■■ Appellants argue that the district court erred in denying David Leisure's motion for mistrial because Fred Prater, while on direct examination by the government, referred to the fact that David Leisure had been indicted in state court in connection with the Faheen bombing. The testimony regarding the indictment was elicited for the purpose of setting the stage for Prater's subsequent conversation with Charles Loewe concerning whether Loewe would cooperate with the authorities if he in turn were indicted. Appellants allege that once the jury knew that David Leisure had been indicted, a mistrial was required due to the prejudice caused by revealing that a state grand jury had found probable cause to believe that he was guilty of the Faheen murder. We need not reach appellants' assertion that this evidence was erroneously admitted, however, because we conclude that any error which might have occurred was harmless. Prater testified directly as to David Leisure's role in the Faheen murder, including admissions made by him and other members of the Leisure group regarding the murder. Several other witnesses and tape-recorded conversations corroborated this testimony. Viewing the record as a whole, the evidence of David Leisure's participation in the Faheen murder was overwhelming.

## VIII. *Cross-examination of the Loewe Witness*

■■■ Appellants next contend that the district court erred in denying Charles Loewe's motion for a mistrial due to the government's cross-examination of James Curtis, a witness for Loewe. The case against Loewe was based, in part, upon testimony from Fred Prater that Loewe had supplied the remote control device used in the fatal bombing of James Michaels, Sr. Prater testified that Loewe had obtained the device from Loewe's friend, who had purchased it from a hobby store. Prater was unaware of the identity of Loewe's friend. Loewe later called an alibi witness, James Curtis, in his defense. On cross-examination, the following exchange occurred:

Q. (by the government) You said that occasionally Charles Loewe may refer to you as Pigface?

A. Yes, sir.

Q. Are you the same Pigface that he had go in the Hobby Shop and buy some remote control devices for him?

There was no testimony at trial that anyone named "Pigface" had gone to a Hobby Shop or purchased a remote control device. Defense counsel immediately objected, and, following a bench conference, the district court adjourned for the day. The following morning the question, not having been answered, was withdrawn. The district court instructed the jury to disregard the question. Later that day the implication planted by the prosecutor's question was directly rebutted by Loewe's testimony that he had not sent Curtis to buy a remote control device from a hobby shop.

Under these circumstances, we find no error in the district court's denial of Loewe's motion for mistrial. We note initially that "[t]he district court has broad discretion in determining whether an allegedly improper question has so tainted the trial as to require a mistrial." *United States v. Robinson,* 774 F.2d 261, 277 (8th Cir.1985). Under most circumstances, an instruction to the jury to disregard the question will suffice to cure any prejudice resulting from the question. *United States v. Muza,* 788 F.2d 1309, 1312 (8th Cir.1986) *(Muza).* Reviewing the issue on appeal, we examine "the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of [appellant's] guilt." *Id.* (quoting *United States v. Reed,* 700 F.2d 638,

646 (11th Cir.1983)). Here, the question was withdrawn before it was answered,[11] a curative instruction was given, and the implication of the question was directly rebutted by the direct testimony of Loewe. Turning to the second consideration under *Muza*, we find that the prejudicial impact of the question was substantially outweighed by the evidence against Loewe. While the question would have been prejudicial to Curtis, had Curtis been on trial, the statement did little to prejudice Loewe on the critical issue of whether he supplied the remote control equipment for the Michaels, Sr. bombing. On this question, the evidence against Loewe was considerable, including direct testimony by Prater, corroborated by other witnesses' testimony and tape-recorded statements. Reviewing the record in its entirety, we are convinced that the jury would have returned the same verdict absent the question put to Curtis. Accordingly, the district court did not abuse its discretion in denying appellants' motion for a mistrial. *See Muza*, 788 F.2d at 1313.

## IX. *Sufficiency of the RICO Evidence*

Appellants next challenge the sufficiency of the evidence to support their RICO convictions. Under RICO, it is a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "The existence of an enterprise at all times remains a separate element which must be proved by the Government." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981) (footnote omitted). Appellants maintain that the evidence at trial was insufficient to support the jury's finding of an "enterprise."

We have previously held that a RICO enterprise must exhibit three basic

characteristics: (1) a common or shared purpose, (2) some continuity of structure and personnel, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering. *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *United States v. Bledsoe*, 674 F.2d at 665. The evidence clearly supports the jury's finding of all three of these factors.

The Leisure group acted out of a common purpose to dominate local labor unions, profit economically from this domination, and murder opponents of their efforts to the extent necessary. The structure and personnel of the Leisure group was continuous and consistent throughout the entire period of racketeering activity. Paul Leisure directed and coordinated the group, except during the period of recovery from his own bombing injuries, when Anthony Leisure stood in his place. Paul Leisure, Anthony Leisure, David Leisure, John Ramo, Joe Broderick, Fred Prater, and Charles Loewe were members of the Leisure group during the entire period of the racketeering events. Each member participated in nearly all of the criminal acts. Finally, the Leisure group clearly had an ascertainable structure distinct from that inherent in the conduct of this pattern of racketeering activity, that is, the sequence of murders and attempted murders. This structure is found in the family and social relationships between the members of the group, and their concerted attempt to gain control of the local unions, which can be viewed in complete isolation from the group's pattern of racketeering activity. Of course, the murders and attempted murders in themselves also shed light on this structure. As the Supreme Court has recognized, "the proof used to establish these separate elements may in particular cases coalesce." *United States v. Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529. Indeed, the evidence in this case seems to fall squarely within an example of

---

11. We reject, however, the government's argument that the trial context of this question was less prejudicial because the witness did not answer it. There is no excuse for this type of rhetorical question, posed without foundation.

a RICO enterprise previously given by this court: "Th[e] distinct structure [of a RICO enterprise] might be demonstrated by proof that ... it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure." *United States v. Bledsoe*, 674 F.2d at 665.

In sum, this is not a case of "a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes." *United States v. Lemm*, 680 F.2d at 1201. We conclude, therefore, that the evidence adequately supported the jury finding that the Leisure group was a RICO enterprise.

### X. *Sufficiency of the Evidence of Obstruction of Justice*

Paul Leisure, David Leisure, and Steven Wougamon challenge the sufficiency of the evidence to support their Count III obstruction of justice convictions under 18 U.S.C. § 1510. These appellants were charged, and found by the jury, to have endeavored to prevent the communication of information relating to the RICO violations to federal law enforcement officials by murdering Michael Kornhardt on or about July 31, 1982. Appellants assert that there was no evidence to show that a federal investigation was underway at the time of the Kornhardt murder, or that appellants had any knowledge that Kornhardt had communicated, or was about to communicate, information to the agents.

■■■ This argument somewhat misses the mark, however, because it is only necessary for a defendant to have believed that a witness might give information to federal officials, and to have prevented this communication, to violate 18 U.S.C. § 1510. *See United States v. San Martin*, 515 F.2d 317, 320–21 (5th Cir.1975). Here, the evidence was more than sufficient that appellants had Kornhardt murdered because they feared that he would become a witness against them. As Paul Leisure himself said, in relation to this possibility, "[h]e would take a lot of good people with him." Wougamon, a friend of Kornhardt, warned

John Ramo that Kornhardt would "turn over and talk to the FBI" following his arrest. The evidence was considerable that appellants had just this possibility in mind when Wougamon and Carbaugh took Kornhardt to a secluded part of St. Charles County and shot him. The evidence was more than sufficient to support appellants' obstruction of justice convictions.

We affirm the convictions of Anthony Leisure, Paul Leisure, Charles Loewe, and David Leisure on all counts, and that of Stephen Wougamon on the Count III obstruction of justice charge. We now turn to the four errors asserted separately by Wougamon.

### XI. *The Amendment of the Indictment*

■■■ In addition to substantive and conspiracy RICO charges in Counts I and II, and an obstruction of justice charge in Count III in connection with the Kornhardt murder, Wougamon was also individually charged in Count IV with a separate obstruction of justice count. Count IV alleged that Wougamon had obstructed justice in violation of 18 U.S.C. § 1510 "by means of intimidation and threats of force" in his dealings with Innes Anderson on the evening of November 9, 1982. As of October 11, 1982, 18 U.S.C. § 1510(a) provided:

> Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator ... [s]hall be fined not more than $5,000, or imprisoned not more than five years, or both.

Effective October 12, 1982, however, Congress amended the statute by, among other things, striking out the terms "misrepresentation, intimidation, or force or threats thereof." Victim and Witness Protection Act, Pub.L. No. 97–291, §§ 4(e), 9(a), 1982 U.S.Code Cong. & Admin.News (96 Stat.) 1248. As a result, Wougamon's alleged threat to Anderson on November 9, 1982, did not constitute a violation of 18 U.S.C. § 1510, and Count IV of the indictment

thus charged him with a crime that had been repealed. Upon Wougamon's pretrial motion to dismiss this count of the indictment, the government responded that even though § 1510 had been amended, Wougamon's threat to Anderson was proscribed by a different statute, 18 U.S.C. § 1512. This statute, as amended on October 12, 1982, provided:

(b) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to ...

(3) hinder, delay, or prevent the communication to a law enforcement officer or a judge of the United States of information relating to the commission or possible commission of a Federal offense [shall be punished].

18 U.S.C. § 1512(b). The district court accepted the government's argument, struck the reference to 18 U.S.C. § 1510 from Count IV of the indictment and, over defense counsel's objection, effectively amended the indictment by instructing the jury on the elements of § 1512 at the close of trial.[12] *See United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir.1983) (jury instructions may have effect of amending indictment). Wougamon asserts that his Count IV obstruction of justice conviction must be reversed because he was effectively convicted of a crime for which he was never indicted. We agree.

Since 1887, it has been "the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962); *see also Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 272–73, 4 L.Ed.2d 252 (1960); *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887); *United States v. Neff*, 525 F.2d 361, 363 (8th Cir.1975) ("Any amendment of the substance of an indictment without resubmission to the grand jury denies a defendant his right to indict-ment by grand jury for infamous crimes."); *United States v. Denmon*, 483 F.2d 1093, 1096–97 (8th Cir.1973). The underlying principles of this rule were well stated by Justice Miller in *Ex parte Bain:*

If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed.

. . . .

... Any other doctrine would place the rights of the citizen, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney; for, if it be once held that changes can be made by the consent or the order of the court in the body of the indictment as presented by the grand jury, and the prisoner can be called upon to answer to the indictment thus changed, the restriction which the Constitution places upon the power of the court, in regard to the prerequisite of an indictment, in reality no longer exists.

121 U.S. at 10, 13, 7 S.Ct. at 786, 787. These principles have been repeatedly reaffirmed by the Court. *See, e.g., Russell v. United States*, 369 U.S. at 770–71, 82 S.Ct. at 1050–51; *Stirone v. United States*, 361 U.S. at 218, 80 S.Ct. at 273 ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."). Of course, amendments to an indictment which are purely matters of form, with no substantive impact, may be permitted. *United*

---

12. The district court, apparently confused by the amendment of the indictment, also submitted to the jury an essential element of a § 1510 offense which was no longer an element of the § 1512 offense.

*States v. Neff,* 525 F.2d at 363 (typographical error in indictment corrected); *United States v. Fruchtman,* 421 F.2d 1019 (6th Cir.) (change in citation of statute), *cert. denied,* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed. 2d 86 (1970); *United States v. Denny,* 165 F.2d 668 (7th Cir.1947) (change in spelling of defendant's name), *cert. denied,* 333 U.S. 844, 68 S.Ct. 662, 92 L.Ed. 1127 (1948). *But see Carney v. United States,* 163 F.2d 784, 788–90 (9th Cir.) (correction of typographical error in indictment was reversible error), *cert. denied,* 332 U.S. 824, 68 S.Ct. 165, 92 L.Ed. 400 (1947).

The amendment to the indictment in this case clearly affected the substance of the indictment. The indictment charged Wougamon with a violation of 18 U.S.C. § 1510; he was convicted of violating 18 U.S.C. § 1512. These crimes are not the same. First, the former § 1510 required a *mens rea* of "willfully," while § 1512, as the jury was instructed, required a *mens rea* of "knowingly." While the gap between the concepts of "knowingly" and "willingly" is not a wide one, the cases do recognize such a distinction. The fifth circuit has noted that "[e]ach encompasses a different element of the requisite *mens rea,* requiring different proof. 'Knowingly' ... requires proof that a defendant acted 'with knowledge.' 'Willfully' ... requires proof that a defendant acted 'deliberately,' or 'deliberately with knowledge.'" *United States v. Mekjian,* 505 F.2d 1320, 1324 (5th Cir.1975) (citations omitted). *See also United States v. Sirhan,* 504 F.2d 818, 820 n. 3 (9th Cir.1974) ("It appears that a 'willful' violation of the law requires more of a specific intent [than a knowing one]."). Were this the only distinction between the crime alleged and the crime Wougamon was convicted of, we might not be inclined to reverse because the effect of this distinction, if any, was to place a more exacting standard of proof on the government. *See United States v. Precision Medical Laboratories, Inc.,* 593 F.2d 434, 444 (2d Cir. 1978). We see no harm in an amendment to an indictment that requires a lesser

*mens rea* than the original indictment, for it does not cast doubt on whether the grand jury would have indicted the defendant for the crime of which he was convicted.

In the present case, however, the crime of indictment, former § 1510, proscribed only "endeavoring" to obstruct communication, while the crime of conviction, § 1512, proscribed "attempting" to obstruct communication. The operative question is whether the term "endeavor" means the same thing as "attempt." We have found no cases interpreting the term "endeavor" as used in § 1510. Several cases, however, have focused on this issue with respect to 18 U.S.C. § 1503, a parallel provision with nearly identical wording which proscribes obstructing justice through influencing or injuring any officer, juror or witness.[13] These cases conclude that an "endeavor" is something less than an "attempt." In *United States v. Russell,* 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921), the Court explained, with reference to the predecessor statute to 18 U.S.C. § 1503, that "[t]he word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to accomplish the evil purpose that the section was enacted to prevent." *Accord United States v. Buffalano,* 727 F.2d 50, 53 (2d Cir.1984) ("The conclusion is that an 'endeavor' under § 1503 does not require proof that would support a charge of attempt, i.e., an 'endeavor' is less than an attempt."); *United States v. Barton,* 647 F.2d 224, 240 (2d Cir.) ("The use of the term 'endeavor[ ]' in [18 U.S.C. § 1503] and its predecessor has been interpreted as embodying a concept less technical than that normally associated with an 'attempt.'"), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Tedesco,* 635 F.2d 902, 907 (1st Cir.1980) ("'endeavor' connotes a somewhat lower threshold of purposeful activity than 'attempt'"), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974

---

**13.** The parallel provision of 18 U.S.C. § 1503 provides: "[w]hoever corruptly, or by threats or force, or by any threatening letter or communi-

cation, endeavors to influence, intimidate, or impede."

(1981); *United States v. Lazzerini,* 611 F.2d 940, 941 (1st Cir.1979) (same); *United States v. Fasolino,* 586 F.2d 939, 940 (2d Cir.1978) (endeavor "does not require proof that would support a charge of attempt").

We think the interpretation in these cases of the term "endeavor" in § 1503 is applicable to the meaning of that term in § 1510. As a result, the grand jury needed to find less evidence to support its indictment for the § 1510 "endeavor" crime than what the petite jury was required to find in order to convict for the § 1512 "attempt" crime. The amendment of the indictment was therefore impermissible. Wougamon was convicted of an offense for which it is impossible to know that the grand jury would have indicted him. Wougamon's conviction on Count IV must be reversed, and this count of the indictment dismissed without prejudice to the government to resubmit it to the grand jury as the government should have done when the problem first came to their attention.

## XII. *Wougamon's RICO Convictions*

■ Wougamon next challenges the validity of his substantive and conspiracy RICO convictions in light of the amendment of the indictment from an alleged violation of 18 U.S.C. § 1510 to submission to the jury under 18 U.S.C. § 1512. To convict Wougamon of the substantive RICO offense, the government needed to establish that he had engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). This term is defined as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" is in turn defined, in pertinent part, by reference to general categories of state crimes, including murder, and a list of specific federal crimes. 18 U.S.C. § 1961(1). The substantive RICO count of the indictment alleged the requisite two acts of racketeering activity that were engaged in by Wougamon: the murder of Michael Kornhardt in violation of state law, and the threat to Innes Anderson in violation of 18 U.S.C. § 1510. At the time of Wougamon's indictment and trial, violations of 18 U.S.C. § 1510 were specifically included in 18 U.S.C. § 1961(1) as "racketeering acts." As discussed above, however, the indictment did not sufficiently state a violation of 18 U.S.C. § 1510, as amended, and hence the indictment was effectively amended by jury instruction to allege instead a violation of 18 U.S.C. § 1512. At the time of Wougamon's trial, however, a violation of 18 U.S.C. § 1512 was not a "racketeering act" as defined in 18 U.S.C. § 1961(1).[14] As a result, the amended indictment failed to allege two acts of racketeering activity, and hence did not allege a substantive violation of RICO, 18 U.S.C. § 1962(c). Accordingly, we reverse Wougamon's Count I substantive RICO conviction.

■ Wougamon's Count II RICO conspiracy conviction must be upheld, however, for this court has recently joined the majority of circuits [15] that hold that a conviction for RICO conspiracy "requires only that each defendant agree to join the conspiracy," not that each agree to commit at least two acts of racketeering activity. *United States v. Kragness,* 830 F.2d 842, 860 (8th Cir.1987). There is ample evidence that Wougamon agreed to join the Leisure RICO enterprise with the knowledge that other members of the enterprise were to commit at least two acts of racketeering

---

**14.** In 1986, Congress included 18 U.S.C. § 1512 within the definition of racketeering activity in 18 U.S.C. § 1961(1). Criminal Law and Procedure Technical Amendments Act of 1986, Pub.L. No. 99–646, § 50(a), 1986 U.S.Code Cong. & Admin.News (100 Stat.) 3592.

**15.** *United States v. Rosenthal,* 793 F.2d 1214 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *United States v. Joseph,* 781 F.2d 549 (6th Cir.1986); *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). Only two circuits have taken the opposite position on this issue. *United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

**1368**

activity.[16]

### XIII. *Conclusion*

We affirm all convictions of Anthony Leisure, Charles Loewe, David Leisure, and Paul Leisure. We affirm the convictions of Steven Wougamon as to Counts II and III, reverse the convictions of Wougamon as to Counts I and IV, vacate his sentences on Counts II and III, and remand to the district court for resentencing as to Wougamon.

---

**16.** In view of our reversal of Wougamon's convictions on counts I and IV, we need not pass on Wougamon's final argument that the district court erred in denying his motion for new trial based on newly discovered evidence. Even accepting all of the testimony of the newly discovered witness as true, it would not have "probably produced an acquittal" on either Count II or III. *See United States v. Lisko*, 747 F.2d 1234, 1238 (8th Cir.1984).