UNITED STATES of America, Plaintiff,

v.

Jeffrey Paul GRUBER, Mark Brian McPherson, David Lester Fairchild, Nicholas Paul Hursh, Gerald Conrad Vanbrocklin, James Lee Truesdell, Robert Nicholas Ross, Jacob Harold Hazlet, Calvin Leonard Flett, Ronald Merrill Gruber, James Lee Leisinger, Kirk Allen Pierce, Lewis Keith Racicot, and Robert Orlando McAlister, Defendants.

No. CR 94–2022.

United States District Court,
N.D. Iowa,
Eastern Division.

Oct. 24, 1995.

Assistant United States Attorneys Kandice Wilcox and Richard Murphy, for U.S.

Wallace L. Taylor, Cedar Rapids, Iowa, for Defendant Pierce.

Mark R. Brown, Cedar Rapids, Iowa, for Defendant Leisinger.

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................ ——
II. FINDING OF FACT ............................................ ——
III. CONCLUSIONS OF LAW ........................................ ——
 A. Probable Cause for Authorizing Title III Interception .................. ——
 B. Analysis of Probable Cause ................................... ——
 C. Necessity Finding Required Under 18 U.S.C. § 2518(3)(c) .............. ——
 D. Facial Challenges to Order and Extension Order Authorizing Interception ....................................................... ——
 E. Monitoring Issues ........................................... ——
 1. Minimization ............................................ ——
 2. Continuation of Interception ....................................... ——
 F. Franks Issue .............................................. ——
IV. CONCLUSION ................................................ ——

## I. INTRODUCTION

In an eighty-seven page, forty count superseding indictment returned on September 28, 1995, Defendants are charged with racketeering, in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering activity, in violation of 18 U.S.C. § 1962(d), conspiracy to distribute and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), distributing and possessing with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), possessing with intent to sell a motor vehicle part knowing that the vehicle identification number of the part had been removed, obliterated, tampered with and altered, in violation of 18 U.S.C. § 2321, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(3), firearms offenses, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(b) and 848(c). All but Defendants Hazlet, Leisinger and Pierce have now entered into plea agreements in this matter.

Defendants Fairchild and Pierce each filed motions to suppress evidence obtained from electronic surveillance and/or motions to suppress intercepted communications evidence derived from an interception authorized under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2520. Although Defendant Fairchild has entered into a plea agreement regarding the charges pending against him, Defendants Pierce and Leisinger have joined in Defendant Fairchild's motion. Thus, Fairchild's motion remains viable, and the court must address the issues raised in it as well as Defendant Pierce's separate motion. Defendant Hazlet has neither filed a motion to suppress nor joined any of the Defendants' motions to suppress. Defendants move to suppress evidence discovered as a result of a wiretap on five grounds: first, that probable cause for the interception did not exist; second, that the necessity requirement of Title III, 18 U.S.C. § 2518(3)(c) had been satisfied; third, that defects exist in the order authorizing interception and the order granting extension of the interception; fourth, that error occurred during the monitoring phase of the interception; and finally, that the interception was continued after its objectives were attained. On October 2, 1995, Defendant Pierce filed a supplemental memorandum which raised for the first time the issue of whether the affidavit used to obtain the wiretaps in this case contains intentional misstatements, and requested an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Government has timely resisted each of Defendants' respective motions.

An evidentiary hearing on Defendants' motions was held on October 2, 1995, at which the United States presented the testimony of Black Hawk County Deputy Larry Wessels, and Special Agent Mark Terra of the Federal Bureau of Investigations. Defendants presented no testimony. The United States was represented by Assistant United States Attorneys Kandice Wilcox and Richard Murphy. Defendant Pierce was represented by Wallace L. Taylor, Cedar Rapids, Iowa. Defendant Leisinger was represented by Mark R. Brown, Cedar Rapids, Iowa.[1] This matter is now fully submitted.

## II. FINDING OF FACT

On October 16, 1993, the United States presented to Chief Judge Michael Melloy its application for interception of wire communications pursuant to Title III. The application was supported by the affidavit of Federal Bureau of Investigations Special Agent Mark Terra ("Terra Aff."). Special Agent Terra's affidavit initially sets forth, *inter alia,* his law enforcement background and experience. Terra Aff. at 1–4. He then identifies the three individuals whose wire communications would be intercepted: Gerald Conrad VanBrocklin, aka "Jerry" or "J.V."; Cynthia Maria Laughlin, aka "Cyndi"; Jeffrey Paul Gruber, aka "No Mind." *Id.* at 4. The affidavit indicates that proposed interception would be for telephone number 319–827–3946, subscribed to by Christine Peverill, and located at 1251 175 Street, Lot # 40, Jesup, Iowa. *Id.* at 4–5. The affidavit then provides background information and the criminal history of each of the three individuals. *Id.* at 7–10. Special Agent Terra's affidavit next sets out the background of the investigation. Terra indicates that since 1987 twenty-two individuals, including six confidential sources subsequently referred to in the affidavit, have identified to task force agents that VanBrocklin "has been involved in trafficking drugs, primarily methamphetamine, between 1987 and the present." *Id.* at 10.

Terra then indicates what information has been provided by a confidential informant, identified in the affidavit as "Source One." The affidavit reveals that Source One has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on numerous occasions during the past one and one-half years." *Id.* It is further revealed that Source One's previous information has served as the basis for two state search warrants which resulted in the arrest of one individual and the seizure of drugs, weapons, and cash. The affidavit goes on to indicate that Source One provided information regarding the investigation, personally knew the individuals distributing the methamphetamine, and that this information had been corroborated through "independent investigative techniques." *Id.* at 11. Source One is identified as providing the following information:

A. In January 1992, Gerald VanBrocklin received his "patch" from the SOS Motorcycle Gang. Receipt of this "patch" made VanBrocklin a full-fledged member of the SOS Motorcycle Gang.

B. In April 1992, VanBrocklin was distributing a large quantity of methamphetamine. One of VanBrocklin's distributors was a person by the last name of Danielson.

C. Methamphetamine seized in a state search warrant executed on September 1, 1992, at the residence of Robert Dennis Folkers came from VanBrocklin. Source One indicated that based on conversation [sic] with VanBrocklin and VanBrocklin's associates, VanBrocklin was Folkers' supplier. (Also see paragraph 13).

D. In January 1993, Source One advised that VanBrocklin was still selling methamphetamine and named two of VanBrocklin's distributors.

*Id.* at 11–12.

Terra indicates that on September 1, 1992, the execution of a search warrant for Folkers' residence resulted in the seizure of more

---

**1.** In addition, Defendants Hursch and Fairchild, and their respective counsel, also appeared at the hearing.

than two ounces of methamphetamine along with packaging materials used in the distribution of methamphetamine. VanBrocklin's vehicle was observed at Folkers' residence at least ten times between August 1991 and September 1992 by law enforcement officers conducting surveillance of Folkers' residence. *Id.* at 12. Folkers committed suicide in November 1992 without ever revealing the source of his methamphetamine. *Id.* at 12–13.

Terra's affidavit next indicates what information has been provided by a confidential informant, identified in the affidavit as "Source Two." The affidavit reveals that Source Two has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on numerous occasions beginning in 1988." *Id.* at 13. It is further revealed that Source Two personally knew the individuals distributing the methamphetamine, and that this information had been corroborated. *Id.* Source Two is identified as providing the following information:

A. In February 1993, Source Two stated that he/she does, on occasion, have personal contact with VanBrocklin. Source Two stated that VanBrocklin is currently buying cars, fixing them up, and selling them. Source Two stated that VanBrocklin is not employed and is getting his money through selling drugs.

B. Source Two has stated, as recently as September 1993, that VanBrocklin is living with a female by the name of Cynthia Laughlin, somewhere in a cabin. Source Two advised that Laughlin is a heavy user of methamphetamine.

*Id.* at 13–14.

Terra's affidavit next indicates what information has been provided by a confidential informant, identified in the affidavit as "Source Three." The affidavit reveals that Source Three has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on numerous occasions during the past five years." *Id.* at 14. It is further revealed that Source Three's previous infor-

mation has served as the basis for a previous court ordered wire interception. *Id.* The affidavit goes on to indicate that Source Three provided information regarding the investigation, personally knew the individuals distributing the methamphetamine for the past ten years, and that this information had been corroborated through "independent investigation of the Task Force." *Id.* Source Three is identified as providing the following information:

A. Source Four is involved in the distribution of methamphetamine. During the spring of 1993, the primary source of Source Four's methamphetamine was Gerald VanBrocklin. Source Three stated as recently as mid-October 1993 that VanBrocklin's source for methamphetamine is Jeff Gruber, aka "No Mind," a color-wearing member of the Sons of Silence, Cedar Falls Chapter, and that Gruber controls the organization's methamphetamine distribution in Iowa.

B. During the spring of 1993, on at least one occasion, he/she overheard VanBrocklin use the telephone at 1251 175th Street, Lot # 40, Jesup, Iowa, number 319–827–3946, to set up a drug transaction.

*Id.* at 15.

Terra's affidavit next pertains to information that has been provided by a confidential informant, identified in the affidavit as "Source Four."[2] The affidavit reveals that Source Four has been cooperating with Task Force Officers for two months and that between April or May 1993 and June 1993 he had purchased several ounce quantities of methamphetamine from VanBrocklin to sell. *Id.* at 16. Source Four indicated that he spoke to VanBrocklin at 319–827–3946 to arrange the purchase of controlled substances. Pen register records have corroborated Source Four's information. Pen register records indicated calls up to June 18, 1993. *Id.* A wire intercept of Source Four's phone was authorized by Judge Melloy on July 9, 1993. During that wire intercept, conversations were intercepted which implicated Source Four in a conspiracy to distribute metham-

---

**2.** The Government has revealed that Source Four is Daryl Waters.

phetamine. On August 2, 1993, Source Four was interviewed recording his involvement in trafficking in methamphetamine and agreed to cooperate with Task Force agents. *Id.* at 16–17. Source Four has furnished the following information:

A. Source Four was introduced to Gerald Conrad VanBrocklin in April or May of 1993. VanBrocklin became Source Four's supplier of methamphetamine after Source Four's original supplier cut him off because of a drug debt. Source Four purchased methamphetamine from VanBrocklin on several occasions before being "cut off" by VanBrocklin due to drug debt owed by Source Four. In about mid-June 1993, Source Four then made a deal with VanBrocklin, where Source Four agreed to sell more methamphetamine for VanBrocklin and pay off the debt. VanBrocklin "shook hands" on this agreement, but VanBrocklin never came through with his part of the deal. Instead, on about June 18, 1993, Source Four believes that VanBrocklin burglarized Source Four's residence, stealing approximately $4,000 worth of items. An Evansdale, Iowa, police report confirms that on June 18, 1993, Source Four reported that his/her residence and garage had been burglarized.

B. While dealing with VanBrocklin to obtain drugs, Source Four contacted VanBrocklin by telephone at 319–827–3946 on several occasions. Pen register information establishes that the last call occurred on June 18, 1993. During each phone conversation, a meeting place and time would be set for delivery of methamphetamine.

*Id.* at 17–18.

Terra further indicates information has been provided by a confidential informant, identified in the affidavit as "Source Five." The affidavit reveals that Source Five provided information to the Federal Drug Task Force in September 1993 that Source Four told Source Five that he was getting his methamphetamine from "the Number 2 man in the Sons of Silence." *Id.* at 18.

Terra's affidavit also details the phone activity between Source Four and VanBrocklin's home phone of 319–827–3946. *Id.* at 19–20. During the week of August 9, 1993, Source Four called VanBrocklin at home and inquired about repayment of a drug debt. This telephone call was monitored and recorded. *Id.* at 20. A subsequent telephone conversation between Source Four and VanBrocklin during the week of August 30, 1993, was also monitored and recorded. VanBrocklin was reached at his home telephone number of 319–827–3946. During this conversation Source Four attempted to arrange a methamphetamine transaction with VanBrocklin, but was told by VanBrocklin that he did not have any methamphetamine at that time, but Source Four could check with "Rabbit" to learn if he had any methamphetamine to sell.[3] *Id.* at 21.

Terra then indicates a confidential informant, identified in the affidavit as "Source Six" has been supplying information to law enforcement officers since mid-September 1993. The affidavit reveals that Source Six personally knew the individuals he has provided information about and has participated in methamphetamine trafficking with these individuals, and that this information had been "corroborated by independent investigation conducted by agents with the Waterloo Area Federal Drug Task Force and other law enforcement agencies." *Id.* at 22. Source Six stated that VanBrocklin deals methamphetamine for Jeff Gruber. Source Six also indicated that Gruber is the "funnel Point" for the Sons of Silence methamphetamine distribution in Iowa. Pen register information indicates contact between VanBrocklin's home telephone number of 319–827–3946 with the telephone numbers of other Sons of Silence members. *Id.* at 22–23. In particular, VanBrocklin's telephone number had been used to place 96 calls to Gruber, the most recent being on October 13, 1993.

VanBrocklin was arrested on January 10, 1993, in Kenner, Louisiana on drug and weapons charges. He subsequently pled

---

3. The affidavit indicates that "Rabbit" is a nickname of Randy Thome.

guilty on July 26, 1993, to the illegal carrying of a weapon. On September 1, 1993, Van-Brocklin and Cynthia Laughlin and Rick E. Schultz were arrested on drug and weapon charges in Tangipahoa Parish, Louisiana. *Id.* at 24.

Terra's affidavit also indicates that one individual who was approached about cooperating in the investigation, Robert Folkers, committed suicide, and that he was possibly encouraged or "goaded" into committing suicide by targets of the investigation after he revealed to them that he had been contacted by law enforcement officers. *Id.* at 25. The confidential sources indicated to law enforcement agents that they would be "fearful for their lives and most certainly would be in a position of jeopardy if their involvement with law enforcement authorities were known to VanBrocklin and/or his associates." *Id.* Terra also relates that one individual from whom several controlled buys were made by federal law enforcement authorities was offered complete immunity, but refused to cooperate. Instead, this individual chose to receive a lengthy prison sentence because he feared for his safety and the safety of his family. *Id.* Terra further relates that "nearly all individuals approached have refused to cooperate, stating that they could be threatened by "death" if they cooperated with law enforcement." *Id.*

On October 16, 1993, Chief Judge Melloy granted the application, finding that probable cause existed that VanBrocklin, Cynthia Maria Laughlin and Jeffrey Paul Gruber, and "others yet unknown" had committed or were committing offenses involving controlled substances. Specifically, the initial wiretap authorization indicated that there was probable cause to believe that the targeted subjects had committed or were committing:

> offenses involving the distribution of and possession with intent to distribute controlled substances, to wit: methamphetamine; conspiracy to distribute and possess with intent to distribute methamphet-

amine; and the unlawful use of a communication facility (telephone) to facilitate these violations of drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 843(b).

Order of Oct. 16, 1993, at 1. Judge Melloy's authorization order incorporated section 2518(5)'s minimization requirement by providing:

> **IT IS FURTHER ORDERED** that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters.

Order of Oct. 16, 1993, at 6–7.

Interim reports were filed with the court as directed on November 2, 1993, November 5, 1993, and November 15, 1993. An application for extension of the interception was granted on November 15, 1993. The extension interception listed "Gerald Conrad Van-Brocklin, aka 'Jerry' or 'J.V.'; Cynthia Maria Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber, aka 'No Mind'; David Lester Fairchild, aka 'Hocus'; James Lee Leisinger, aka 'Crazy'; Rollyn Brent Luethje; Scott Leo Laughlin; Christine Marie Peverill, aka 'Casper,' and others yet unknown" as individuals for whom probable cause had been developed. The November 15, 1993, order extending authorization contained the same authorized offenses.[4]

---

4. Judge Melloy's extension order contained the following minimization language:

 **IT IS FURTHER ORDERED** that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to inter-

ception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined [sic] during the portion of conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring

On December 3, 1993, Black Hawk County Deputy Sheriff Larry Wessels monitored a call between VanBrocklin and Defendant Pierce ("Call 601"). Prior to that time Wessels had been provided with minimization instructions from the United States Attorney for the Northern District of Iowa.[5] Pursuant to those minimization instructions, Wessels followed procedures in monitoring telephone calls. When a telephone call came in Wessels would first attempt to identify the parties involved in the call and if the telephone call was of a personal nature he would minimize it.[6] Similarly telephone calls involving attorneys, doctors or clergy were minimized immediately. Telephone calls which involved individuals who had previously been identified as being involved in criminal activity were subjected to closer attention. In regards to Call 601, Wessels did not minimize it. He believed the call was relevant because Pierce referred to going to a bar for business, discussed going to church, which to Wessels signified a meeting of the Sons of Silence at the clubhouse, and mentioned "the King," which Wessels took to be a reference to Gruber.

On December 4, 1993, Mike Lashbrook monitored a telephone call between Pierce and VanBrocklin in which Pierce asked VanBrocklin what was going on ("Call 634"). The two then discussed going to a casino. The telephone call lasted a little over a minute and a half. Because of the length of the telephone call it wasn't minimized.[7] On De-

cember 5, 1993, Wessels monitored a telephone call between Pierce and VanBrocklin ("Call 639"). Wessels did not minimize that telephone call because he perceived it to involve a conversation regarding the securing of drugs.

On December 10, 1993, Judge Melloy was contacted by the Government and informed of a conversation relating to possible offenses of obstruction of justice, destruction of evidence and the making of false statements to a law enforcement officer. On December 14, 1993, Judge Melloy granted the Government permission for the continued interception of wire communications related to those offenses.

## III. CONCLUSIONS OF LAW

Because of overlap in some of the issues raised in Defendants' motions, the court will proceed by addressing each of the individual issues raised by the motions *seriatim*.

### A. Probable Cause for Authorizing Title III Interception

Initially, the court must determine whether Chief Judge Melloy was presented with probable cause for issuance of the order authorizing Title III interception. The Eighth Circuit reviewed the history and organization of Title III in its decision in *United States v. Moore*, 41 F.3d 370 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995):

agent shall spot check to ensure that the conversation has not turned to criminal matters. Order of Nov. 15, 1993, at 6. It is clear that language was inadvertently omitted from the second line of this paragraph. Obviously, the second line of this paragraph was intended to be identical to that found in the original authorization order:

Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the conversation is criminal in nature.

Order of Oct. 16, 1993, at 7.

**5.** The minimization instructions are Government Exhibit "1".

**6.** Deputy Sheriff Wessels would minimize a call by shutting off the system. He would then "spot check" the telephone calls by going back on every few minutes to ascertain whether the nature of the conversation had changed to something of a criminal nature. This is similar, if not identical to the "two minutes up/one minute down" minimization technique recommended in a Department of Justice Manual and reviewed favorably by the Eighth Circuit in both *United States v. Smith*, 909 F.2d 1164, 1166 (8th Cir. 1990), *cert. denied*, 498 U.S. 1032, 111 S.Ct. 691, 112 L.Ed.2d 682 (1991), and *United States v. Losing*, 560 F.2d 906, 909 n. 1 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977).

**7.** Law enforcement agents would monitor all calls, except conversations with a spouse, clergy, doctor, or attorney, for a minute and a half before minimizing it.

The federal wiretap statute was first enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 212–223, codified at 18 U.S.C. §§ 2510–2520. The law has dual purposes, "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968–2 U.S.C.C.A.N. 2112, 2153. Congress followed the constitutional standards of *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in drafting Title III. *Id.* at 2163.

The statute broadly prohibits wiretaps "[e]xcept as otherwise specifically provided in this chapter." § 2511(1). It mandates detailed procedures that law enforcement officials must follow in applying for a wiretap order, see §§ 2516, 2518(1), and specific findings that a judge must make in issuing a wiretap order, *see* § 2518(3). It also specifies in detail the substantive provisions of the wiretap approval order, *see* § 2518(4), and it limits the duration of the order and any extension order, *see* § 2518(5). Finally, the statute prohibits the use of wiretap evidence in any trial "if the disclosure of that information would be in violation of this chapter." § 2515. Section 2518(10)(a) defines the disclosures prohibited by § 2515 and the standards for suppressing wiretap evidence. *See Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831. *Id.* at 374.

An application for authority to conduct electronic surveillance must include facts establishing probable cause to believe: (1) that an individual has committed or is about to commit a particular offense; (2) that the facilities from which communications are to be intercepted are being used in connection with the commission of that offense; and (3) that electronic surveillance will therefore result in interception of communications related to the offense. 18 U.S.C. § 2518(3); *United States v. Leisure*, 844 F.2d 1347, 1354

(8th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

 The court begins its analysis by noting that affidavits in support of electronic surveillance orders are to be judged by the same standards as conventional search warrants; the statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the Fourth Amendment. *United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir.1990), *cert. denied*, 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *Leisure*, 844 F.2d at 1354; *United States v. Townsley*, 843 F.2d 1070, 1076 (8th Cir.1988); *see United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Falcone*, 505 F.2d 478, 481 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975). The court is further cognizant that

[t]he application for the wire interception must be viewed in a "commonsense way" to determine if there were ample facts to establish probable cause to grant the wire interception request. "[I]n judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense."

*United States v. Kirk*, 534 F.2d 1262, 1274 (8th Cir.1976) (citation omitted).

 The seminal case of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), provides the standard an issuing court must follow in determining whether probable cause supports an application for electronic surveillance and, consequently, the duty of the reviewing court when considering the propriety of that determination:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay infor-

mation, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. at 2332. The question presented on review of an issuing judicial officer's determination is not whether the reviewing court would have issued the warrant based on the affidavit as presented, but whether the court which did issue the warrant had a " 'substantial basis for … conclud[ing]' that probable cause existed." *Id.* at 238–239, 103 S.Ct. at 2332 (citation omitted). Thus, a reviewing court does not conduct a de novo review of the issuing judge's determination, but must instead afford it great deference. *Id.* at 236, 103 S.Ct. at 2331; *see United States v. Macklin,* 902 F.2d 1320, 1324 (8th Cir.1990), *cert. denied sub nom. Woods v. United States,* 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991). As the Court explained in *Gates:*

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." [*Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969) ]. "A grudging or negative attitude toward warrants," [*United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965) ], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.,* at 109, 85 S.Ct. at 746.

*Gates,* 462 U.S. at 236, 103 S.Ct. at 2331; *see also United States v. Gladney,* 48 F.3d 309, 312 (8th Cir.1995).

As the Eighth Circuit has observed:

> Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched.

*Gladney,* 48 F.3d at 312 (quoting *United States v. Bieri,* 21 F.3d 811, 815 (8th Cir.

1994). Equally on point is the observation of Justice (then Judge) Kennedy:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. *The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.*

*United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.1985), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (emphasis added in part) (citations omitted). Where, as here, the issuing judge relied solely on the affidavit presented to him, " 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.' " *Gladney,* 48 F.3d at 312 (quoting *United States v. Leichtling,* 684 F.2d 553, 555 (8th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983)).

### B. Analysis of Probable Cause

In essence, the challenge Defendants mount to Terra's affidavit represents an attempt to hide the forest by magnifying its individual trees. Such an approach to probable cause determinations is inconsistent with the standard of review set forth in *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33, and has been specifically rejected by the Eighth Circuit. *See Leisure,* 844 F.2d at 1354. In *Leisure,* the Eighth Circuit stated:

> Appellants engage in a "divide and conquer" attack on the affidavit, and urge this court to undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole. We decline this invitation to review the affidavit in an overly stringent and hypertechnical fashion. "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief" that evidence of criminality by the subject of surveillance would be obtained.

*Id.* (quoting *Carter v. United States,* 729 F.2d 935, 939 (8th Cir.1984)); *see also United States v. Townsley,* 843 F.2d 1070, 1076 (8th

Cir.1988) ("punctilious paragraph-by-paragraph dissection of the supporting affidavit" "not our standard of review").

■ Upon review of Terra's affidavit the court is persuaded that it establishes probable cause. In his affidavit Terra reviews information which was obtained during an investigation of VanBrocklin. It contains information from six separate confidential informants. The reliability of each of these informants is attested to in the affidavit. In addition, much of the information supplied by the six confidential informants is corroborated by means of pen register, and undercover surveillance. The court will review some of the information contained in Terra's affidavit. First, Source One, who personally knew the individuals distributing the methamphetamine, provided information that in April 1992, VanBrocklin was distributing a large quantity of methamphetamine, and that methamphetamine seized in a state search warrant executed on September 1, 1992, at the residence of Robert Dennis Folkers came from VanBrocklin. Source One further indicated that, based on a conversation he had with VanBrocklin and VanBrocklin's associates, VanBrocklin was Folkers' drug supplier. Finally, Source One advised that in January 1993, VanBrocklin was still selling methamphetamine and named two of VanBrocklin's distributors.

Next, Source Two, who again personally knew the individuals distributing the methamphetamine, provided information that in February 1993, VanBrocklin was not employed and was getting his money through selling drugs. Additionally, Source Two stated, as recently as September 1993, that VanBrocklin was living with a female by the name of Cynthia Laughlin, somewhere in a cabin, and that Laughlin was a heavy user of methamphetamine. Terra's affidavit next indicates that information has been provided by Source Three that Source Four is involved in the distribution of methamphetamine, and during the spring of 1993, the primary source of Source Four's methamphetamine was Gerald VanBrocklin. Source Three further stated as recently as mid-October 1993 that VanBrocklin's source for methamphetamine was Jeff Gruber, and that

Gruber controls the Sons of Silence organization's methamphetamine distribution in Iowa. Finally, Source Three indicated that during the spring of 1993, he or she overheard VanBrocklin use the telephone at 1251 175th Street, Lot # 40, Jesup, Iowa, number 319–827–3946, to set up a drug transaction.

Source Four indicated that between April or May 1993 and June 1993 he had purchased several ounce quantities of methamphetamine from VanBrocklin to sell. Source Four further indicated that he spoke to VanBrocklin at 319–827–3946 to arrange the purchase of controlled substances. Pen register records corroborated Source Four's information. Source Four also furnished information that Source Four was introduced to Gerald Conrad VanBrocklin in April or May of 1993, and that VanBrocklin became Source Four's supplier of methamphetamine. In mid-June 1993, Source Four then made a deal with VanBrocklin, where Source Four agreed to sell more methamphetamine for VanBrocklin and pay off the debt. Although VanBrocklin "shook hands" on this agreement, VanBrocklin never carried out his part of this deal. Source Four also stated that while dealing with VanBrocklin to obtain drugs, Source Four contacted VanBrocklin by telephone at 319–827–3946 on several occasions.

Terra's affidavit reveals that Source Five provided information to the Federal Drug Task Force in September 1993 that Source Four told Source Five that he was getting his methamphetamine from "the Number 2 man in the Sons of Silence." Finally, Terra's affidavit reveals that Source Six personally knew the individuals he was providing information about, and had participated in methamphetamine trafficking with these individuals. Source Six stated that VanBrocklin deals methamphetamine for Jeff Gruber, and that Gruber was the "Funnel Point" for the Sons of Silence methamphetamine distribution in Iowa.

After reviewing Terra's affidavit and considering the applicable law, the court concludes that Terra's affidavit provided Chief Judge Melloy with a "substantial basis" for finding probable cause to believe that the named individuals were engaging in or dis-

cussing criminal activity. Therefore, this aspect of Defendants' motions is denied.

## C. *Necessity Finding Required Under 18 U.S.C. § 2518(3)(c)*

▋ Defendants next seek to suppress the evidence obtained as a result of the interception on the ground that the Government's application to Chief Judge Melloy for the wiretap authorization failed to establish the need for electronic surveillance as required by Title III. Title III requires that applications for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous." *Macklin*, 902 F.2d at 1327; *see United States v. Davis*, 882 F.2d 1334, 1343 (8th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990). Section 2518(1)(c) requires a showing of necessity "to insure that wiretaps are not routinely employed as the initial step in an investigation." *Id.* at 1326. However, the Eighth Circuit has pointed out that

> this court has consistently held that satisfying the provisions of section 2518(1)(c) and (3)(c) does not require the government to exhaust every available investigative technique before a wiretap may be authorized. In *United States v. Losing*, 560 F.2d 906 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), we said:
>
> > Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could be issued.... Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation" and "... to assure that wiretapping is not resorted to in situations where traditional investiga-

> > tive techniques would suffice to expose the crime."
>
> 560 F.2d at 910 (quoting *Daly*, 535 F.2d at 438).

*United States v. O'Connell*, 841 F.2d 1408, 1414 (8th Cir.), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). "[W]hile the statute does require that normal investigative procedures be used first, it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap." *Macklin*, 902 F.2d at 1326; *Leisure*, 844 F.2d at 1356; *O'Connell*, 841 F.2d at 1415. Thus, the law is clear in this circuit that the requirements of section 2518 were not intended to turn electronic surveillance into a tool of last resort. *Macklin*, 902 F.2d at 1326; *United States v. Matya*, 541 F.2d 741, 745 (8th Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *see also United States v. Martino*, 664 F.2d 860, 868 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

▋ Turning to the Terra affidavit, the affidavit states that before applying for the wiretap authorization, the investigation had consisted of confidential informants, physical surveillance, telephone pen registers, and telephone toll records. The affidavit also set forth that witnesses in the case would be unlikely to testify voluntarily. In fact, several of the witnesses who did provide information did so only upon the assurance that their identities would not be disclosed and that they would not be called to testify. Furthermore, one individual committed suicide shortly after being contacted about cooperation in the investigation, and another individual, who was offered immunity, chose to accept a lengthy prison sentence instead of cooperation. The affidavit also stated that the location of surveillance of VanBrocklin's home was made difficult by its location. VanBrocklin had approached officers three times while the officers were attempting to conduct surveillance near his home. Thus, the affidavit details ways in which the pre-application investigation had resulted in an incomplete picture of the drug-trafficking organization that was the target of the investigation.

The court is convinced that the Government's October 16, 1993, application for the authorization for wire interception more than satisfied the requirements of section 2518. As was pointed out above, the law in this circuit is clear that the requirements of section 2518 were not intended to turn electronic surveillance into a tool of last resort. *Macklin,* 902 F.2d at 1326; *Matya,* 541 F.2d at 745; *see also Martino,* 664 F.2d at 868. Given that the Terra affidavit set forth both previous investigative efforts and how important information concerning the organization in this case not ·been disclosed by those efforts, the court concludes that the Government's application satisfied the requirements of 18 U.S.C. § 2518(3)(c). Accordingly, this portion of Defendants' motions to suppress are denied.

### D. *Facial Challenges to Order and Extension Order Authorizing Interception*

Next the court takes up several assertions made in Defendant Fairchild's motion regarding alleged defects which appear on the face of the order or extension of the order authorizing interception.[8]

■■■■■ " 'A wiretap authorization order is presumed proper,' and Defendants carry the burden of overcoming this presumption." *United States v. Williams,* 45 F.3d 1481, 1484 (10th Cir.1995) (quoting *United States v. Nunez,* 877 F.2d 1470, 1472 (10th Cir.), *cert. denied,* 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989); *see also United States v. Newman,* 733 F.2d 1395, 1398 (10th Cir. 1984); *United States v. Feldman,* 535·F.2d 1175, 1180–81 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976). Although the requirements of Title III should be strictly observed, not· "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.' " *United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1855–56, 40 L.Ed.2d 380 (1974). Defendants must not only demonstrate a deviation from the statutory requirements of Title III, but this deviation must be substantial. Technical defects do not constitute substantial deviations. *United States v. Moore,* 41 F.3d 370, 374 (8th Cir.1994); *see United States v. Traitz,* 871 F.2d 368, 369 (3d Cir.), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Swann,* 526 F.2d 147, 149 (9th Cir.1975); *United States v. Joseph,* 519 F.2d 1068, 1070 (5th Cir.), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1989); *United States v. Vigi,* 515 F.2d 290, 293 (6th Cir.), *cert. denied,* 423 U.S.· 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975).

■■■■ Under 18 U.S.C. § 2518(4)(a), each wiretap order must specify "the identity of the person, if known, whose communications are to be intercepted." Defendants assert that Judge Melloy's orders fail to comply with section 2518(4)(a). Both the original order authorizing interception filed on October 16, 1993, and the extension of that order filed on November 15, 1993, clearly meet the requirements of section 2518(4)(a). The original order ·identifies "Gerald Conrad Van-Brooklin, aka ' Jerry" or 'J.V.'; Cynthia Marie Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber aka 'No Mind', and others yet unknown ..." Similarly, the extension order identifies "Gerald Conrad VanBrocklin, aka 'Jerry' or "J.V."; Cynthia Maria Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber, aka 'No Mind'; David Lester Fairchild, aka 'Hocus'; James Lee Leisinger, aka 'Crazy'; Rollyn Brent , Luethje; Scott Leo Laughlin; Christine Marie Peverill aka 'Casper,' and others yet unknown ..." as individuals for whom probable cause had been developed. Thus, the original order and the extension both fully complied with section 2518(4)(a).

■■■■ Defendants also point to the December 14, 1993 order issued by Judge Melloy during the period of interception authorized by the original order and the extension. The December 14, 1993, order was sought pursuant to 18 U.S.C. § 2517(5). Title III clearly contemplates that law enforcement officials will, in the course of intercepting conversations related to specified target offenses, in-

---

8. As the court pointed out above, Defendant Fairchild has entered into a plea agreement in this case. Defendants Pierce and Leisinger, however, both joined in his motion. Therefore, the court · must address those issues which are raised only in Fairchild's motion.

tercept conversations "relating to offenses other than those specified in the order of authorization or approval." *See* 18 U.S.C. § 2517(5). For example, an intercepted conversation can relate to both a specified offense and to an unspecified offense. Under 18 U.S.C. § 2517(5), the Government may secure a court's blessing to disclose the contents of an "other offense" interception in connection with a federal prosecution. *See United States v. Barnes,* 47 F.3d 963, 964 (8th Cir.1995). As the Eighth Circuit explained in *Barnes:*

> The danger inherent in disclosure without judicial approval is that the original application may have been a subterfuge, that is, the government, not having probable cause to obtain a wiretap for some crime, might obtain it by purporting to investigate a different crime. We have acknowledged the potential for this kind of abuse.

*Id.* at 964 (citing *United States v. Sedovic,* 679 F.2d 1233, 1237 n. 4 (8th Cir.1982)). The relevant statutory provision, however, permits disclosure when the interception has been "authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of [Title III]. Such application shall be made as soon as practicable." 18 U.S.C. § 2517(5). It is settled that disclosure authorization "can be implicitly obtained when a judge grants a renewal of a wiretap after being advised of the essential facts of the unspecified violation." *United States v. McKinnon,* 721 F.2d 19, 23–24 (1st Cir.1983). Furthermore, judicial approval of an interception of evidence relating to unauthorized offenses can be retroactively granted. *Barnes,* 47 F.3d at 965.

■ Here, this standard was clearly met. The initial wiretap authorization in this case was made by Judge Malloy in this district on October 16, 1993. Judge Melloy's initial order indicated that there was probable cause to believe that the targeted subjects had committed or were committing:

> offenses involving the distribution of and possession with intent to distribute controlled substances, to wit: methamphetamine; conspiracy to distribute and possess with intent to distribute methamphetamine; and the unlawful use of a communication facility (telephone) to facilitate these violations of drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 843(b).

Order of Oct. 16, 1993, at 1. The November 15, 1993 order extending authorization contained the same authorized offenses. On December 10, 1993, Judge Melloy was contacted by the Government and informed of a conversation relating to possible offenses of obstruction of justice, destruction of evidence and the making of false statements to a law enforcement officer. The Government then sought permission to continue to intercept conversations related to these offenses. As a result, the judicial officer was "made aware of the 'material facts constituting or clearly relating to'" these possible violations by the Government. Thus, the December 14, 1993 order added these offenses as authorized offenses. Accordingly, finding no violation of section 2517(5) to have occurred, this aspect of Defendants' motion to suppress is denied.

### E. Monitoring Issues

Defendants also assert that errors occurred during the monitoring of conversations which warrant suppression. The court will address each of these assertions in turn.

### 1. Minimization

■ Title III provides that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). This statutory provision implements "the constitutional mandate ... that wiretapping must be conducted with particularity." *United States v. Daly,* 535 F.2d 434, 440 (8th Cir.1976). The minimization requirement requires the Government to reduce, to the maximum extent possible, the interception of communications other than those it has authority to intercept. *Macklin,* 902 F.2d at 1328; *Daly,* 535 F.2d at 441. Section 2518(5) was enacted to comply with the mandate of *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that wiretapping be conducted with particularity. *United States v. Garcia,* 785

F.2d 214, 224 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *Daly,* 535 F.2d at 440.

 "Whether minimization has taken place depends upon 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time.'" *United States v. Fregoso,* 60 F.3d 1314, 1323 (8th Cir.1995) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978)). Each case must be examined on its own particular facts. *Scott,* 436 U.S. at 140–41, 98 S.Ct. at 1724–25; *United States v. Ozar,* 50 F.3d 1440, 1447 (8th Cir.1995); *Garcia,* 785 F.2d at 224 (quoting *Scott,* 436 U.S. at 139, 98 S.Ct. at 1724); *United States v. O'Connell,* 841 F.2d at 1416; *Daly,* 535 F.2d at 441. "Relevant considerations include the number of target individuals, the ambiguity of the intercepted conversations, the complexity of the acts under investigation, and the extent of the issuing judge's involvement in the surveillance." *Ozar,* 50 F.3d at 1447; *see Macklin,* 902 F.2d at 1327; *see also O'Connell,* 841 F.2d at 1416–17; *Garcia,* 785 F.2d at 224. Additionally, " '[w]hen the investigation is focusing on what is thought to be a wide-spread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly intercepted because they will involve one or more of the co-conspirators.'" *Ozar,* 50 F.3d at 1447 (quoting *Scott,* 436 U.S. at 140, 98 S.Ct. at 1725). Where, as here, the adequacy of the Government's minimization effort is challenged, the government has the burden of proving proper minimization. *United States v. Torres,* 908 F.2d 1417, 1423 (9th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 228 (1990); *United States v. Armocida,* 515 F.2d 29, 43 (3rd Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) (quoting *Berger,* 388 U.S. at 57, 87 S.Ct. at 1882); *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

 Judge Melloy's original authorization order incorporated section 2518(5)'s minimization requirement by providing:

**IT IS FURTHER ORDERED** that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters.

Some latitude obviously must be afforded to monitoring agents who are charged with the difficult task of determining which intercepted conversations are pertinent and which are not, which should be minimized and which listened to. In *Daly,* 535 F.2d at 441–42, the Eighth Circuit recognized that "monitoring agents are not gifted with prescience." Interception of innocent conversations cannot be eliminated in toto. Considering the evidence presented before the court at the hearing, the court finds that the monitoring agents made reasonable efforts to minimize their interception of non-pertinent conversations and that they did not disregard the terms of the court's authorization orders. The record shows that agents were specifically apprised of minimization procedures to be employed in a Title III investigation. This memoranda discussed, *inter alia,* the importance of immediately terminating the interception of legally privileged conversations. Although no specific time limit was set, the agents all understood that they were to discontinue monitoring a conversation after approximately a minute and a half unless the communications overheard were pertinent to the investigation. At most the record demonstrates the unremarkable fact that the interception resulted in the brief monitoring of calls unrelated to the criminal activity being investigated. *See Torres,* 908 F.2d at 1423–24 (holding that the mere intercep-

tion of calls unrelated to the alleged criminal activity does not indicate a failure to meet the minimization requirement). Thus, the court concludes that Pierce's challenge to the interception on the ground of lack of minimization is denied.

### 2. Continuation of Interception

■■■ Defendant Pierce further asserts that the interception was continued impermissibly after its objectives were obtained. Under 18 U.S.C. § 2518(5), an intercept "must terminate upon attainment of the authorized objective." The Government stated that the objective of the intercept in this case was to determine the means of drug trafficking, the identity of individuals involved in the specified offenses, the times and locations, and sources of illegal drugs, how money derived from the sales of drugs was being laundered, and the nature and scope of the drug conspiracy. Defendants have failed to show that the objective of the wiretap was met prior to its termination. *See United States v. Nguyen,* 46 F.3d 781, 782 (8th Cir. 1995) (holding that "[a] wiretap may be lawfully extended where the investigating officers had not yet learned of the extent of the conspiracy and the identity of the coconspirators."); *United States v. Brown,* 941 F.2d 656, 659 (8th Cir.1991) (holding that a wiretap may lawfully continue past the point that officers learned of the defendant's source of drugs because the officers had not yet learned of the extent of the conspiracy and the identity of the co-conspirators).

### F. Franks Issue

■■■ Defendant Pierce also challenges the interception on the grounds that the application contained false statements in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* the Supreme Court held that the inclusion of an intentionally or recklessly false statement of fact necessary for the determination of probable cause may constitute grounds for suppression. *Id.* at 155–56, 98 S.Ct. at 2676–77; *see United States v. Falls,* 34 F.3d 674, 681 (8th Cir.1994). A *Franks* hearing permits a defendant to challenge the veracity of a search warrant affidavit.

*Franks,* 438 U.S. at 156, 98 S.Ct. at 2676–77. Defendants are entitled to such a hearing only if they satisfy two requirements:

First, the defendant must make a substantial preliminary showing of an intentional or reckless falsehood in the affidavit. *Franks,* 438 U.S. at 155–56 [98 S.Ct. at 2676]. "The substantiality requirement is not lightly met." *United States v. Wajda,* 810 F.2d 754, 759 (8th Cir.), *cert. denied,* 481 U.S. 1040 [107 S.Ct. 1981, 95 L.Ed.2d 821] (1987). "Allegations of negligence or innocent mistake are insufficient." *Franks,* 438 U.S. at 171 [98 S.Ct. at 2684]. Second, the allegedly false statements must be necessary to the finding of probable cause. *Id.* at 156 [98 S.Ct. at 2677]. *United States v. Curry,* 911 F.2d 72, 76 (8th Cir.1990), *cert. denied,* 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991); *Franks,* 438 U.S. at 156 [98 S.Ct. at 2677].

*United States v. Schenk,* 983 F.2d 876, 879–80 (8th Cir.1993). Defendants bear the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit. *United States v. Ozar,* 50 F.3d 1440, 1445 (8th Cir.1995); *United States v. Garcia,* 785 F.2d 214, 222 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).

In *Franks,* the Supreme Court enunciated its now familiar standard for challenges to inaccurate information contained in a warrant application.

[W]e hold that, where defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with a reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same

extent as if probable cause was lacking on the face of the affidavit.

*Franks,* 438 U.S. at 155–156, 98 S.Ct. at 2676.

■ In order to successfully challenge a warrant affidavit under *Franks,* a defendant must show:

1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and 2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: 1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*Gladney,* 48 F.3d at 313 (quoting *United States v. Humphreys,* 982 F.2d 254, 258 n. 2 (8th Cir.1992)); *see Falls,* 34 F.3d at 681; *United States v. Lucht,* 18 F.3d 541, 546 (8th Cir.1994); *United States v. Lueth,* 807 F.2d 719, 726 (8th Cir.1986); *United States v. Reivich,* 793 F.2d 957, 960 (8th Cir.1986).

In *Franks,* the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676 (emphasis added). The Court continued,

[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or

their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks,* 438 U.S. at 171, 98 S.Ct. at 2684; *see also Rivera v. United States,* 928 F.2d 592, 604 (2d Cir.1991) (noting that "[t]he Franks standard is a high one").

■ Pierce's argument falls short of the "substantial preliminary showing" required by *Franks* and its progeny. Here, because Defendant Pierce has not met the substantiality requirement in this case, the court shall deny his request for a *Franks* hearing on this aspect of his respective motion to suppress. The court notes initially that Defendant Pierce delayed filing his request for a *Franks* hearing because he was awaiting a ruling by Judge Melloy regarding the disclosure of the identities of the confidential informants in this case. This request was denied by Judge Melloy. Without knowing the identities of the confidential informants, Defendant Pierce is relegated to speculating regarding possible misstatements made by all but confidential informant number four, who was identified by the Government to be Daryl Waters. The court will address each of Pierce's claims of misrepresentation in turn.

First, Pierce points to an alleged inconsistency between statements made by Waters and Source Five regarding Waters' drug source. Both of these statements, however, are set out in the affidavit. Thus, Judge Melloy was aware of them at the time he granted the intervention. Furthermore, while Source Five stated that Waters told him that Waters' source of drugs was "[t]he Number 2 Man in the Sons of Silence," this individual is not identified by Source Five. Thus, Pierce speculates when he claims that the person identified had to be Jeff Gruber.

Next, Pierce asserts that certain allegations regarding Waters' resuming involvement in methamphetamine sales contain material misrepresentations. Here, however, Pierce has not substantiated his claim with a copy of Waters' October 13th statement or an affidavit of the officers. Pierce further asserts that a material misrepresentation occurred when it was stated that Waters' source of methamphetamine in October 1993

was unknown. This assertion is based on a statement by Becky Tix which identifies one of Waters' sources of drugs as of April 1993. No misrepresentation is demonstrated here. Tix's statement, however, does not form any basis for the affiant to conclude who Waters' source of drugs was in October 1993.

Pierce next challenges the affiant's assertion that Source Three supplied information that Gruber was VanBrocklin's drug source. Here again, Pierce has not supplied the court with a copy of the statement which purportedly contradicts the affiant's declaration. Thus, Pierce has not demonstrated the existence of any misstatement in Terra's affidavit. Pierce also challenges information contained in paragraph 22(A) of Terra's affidavit in which it is stated that Waters began to purchase drugs from VanBrocklin because he was being cut off from another supplier because of a drug debt. Waters had told officers on August 2, 1993, that he had been cut off because of the execution of a search warrant. Tix related that Waters had been cut off because of a drug debt. It was this latter explanation which was related by Terra in his affidavit. Pierce, however, has not demonstrated that Waters' explanation of August 2, 1993, was incorrect. Indeed, the Government relates in its response that Waters' testimony before the grand jury was that he had been at some point cut off by suppliers for both reasons.[9] Pierce further claims that Terra's statement in paragraph 20 of his affidavit in which he stated that Source Four purchased "several one ounce quantities of methamphetamine from VanBrocklin" is false. Pierce claims that Waters stated in an interview that he only purchased a total of two and a half ounces of methamphetamine from VanBrocklin. From this Pierce hypothesizes that only two deliveries, not "several" occurred. Pierce again has not produced the report upon which he bases his argument. The Government, however, does not contest the existence of this report. Rather the Government states that the report states "that in the month and a half to two months that he dealt with VanBrocklin, he purchased two and one-half ounces of methamphet-

amine from him, dealing mainly in ounce quantity deliveries."[10] Clearly, the report does not state that only two deliveries occurred. Although only two one ounce deliveries could have occurred given the physical limitations on the amount of methamphetamine involved, Pierce has not demonstrated a misrepresentation here.

Pierce next challenges information in the affidavit from Source One that Robert Folkers was obtaining methamphetamine from VanBrocklin. Pierce has not demonstrated that this information was false or a misrepresentation when the affidavit was submitted to the court. Pierce relies solely on a purported statement by VanBrocklin on February 22, 1995, that James Truesdell, not he was Folkers' supplier. This does not establish that Terra did not receive information from Source One as reported. The court next turns to Pierce's contention that Terra's affidavit contains a misrepresentation in paragraph 28 in which it is stated that Source Five was told by Waters that he owed the Sons of Silence $10,000. Pierce has not demonstrated that Source Five did not tell Terra this information, only that as of August 2, 1993, Waters claimed that the debt was $850. This does not demonstrate what Source Five told Terra. Pierce also claims that Terra's affidavit fails to reveal the extent of Waters' drug trafficking. Terra's affidavit, however, specifically mentions that Waters was involved in drug trafficking. Thus, there was no attempt by Terra to minimize or hide Waters' illegal actions from the court. Similarly, the court was apprised of the fact that Waters attributed the burglarization of his home to VanBrocklin. As a result, the court was informed of the grounds for animosity between VanBrocklin and Waters. Finally, Pierce has not demonstrated that the calls between Waters and VanBrocklin were not related to drug trafficking. Pierce speculated that the last of these calls was not drug related. Pierce, however, does not point the court to any statement by Waters which would reflect this assertion.

Therefore, because Pierce's argument falls short of the "substantial preliminary show-

---

9. The court notes that the Government has not produced a transcript of Waters' grand jury testimony to substantiate its assertion.

10. Pierce does not contest that this is an accurate statement of the report.

ing" required under *Franks* and its progeny, his request for an evidentiary hearing on his *Franks* challenge is denied.

### IV. CONCLUSION

First, the court concludes that probable cause existed for issuance for the authorizations. Second, the court finds that the wiretaps were necessary, and not the initial step in the investigation. Next, the court concludes that each wiretap order complied with section 2518(4)(a) by specifying the identity of the person whose communications were to be intercepted. The court further finds that the minimization requirement was met by the Government's actions to reduce, to the maximum extent possible, the interception of communications other than those it had authority to intercept. It also concludes that law enforcement officers did not continue the wiretaps after obtaining their objective. Finally, the court determines that the applications did not contain false statements in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Therefore, the court denies on all grounds asserted Defendants Pierce and Leisinger's respective motions to suppress.

**IT IS SO ORDERED.**